No. 24-1619

# United States Court of Appeals for the First Circuit

JAMES DOE, Individually and as Natural Parent and Next Friend of John Doe; and JANE DOE, Individually and as Natural Parent and Next Friend of John Doe, Plaintiffs - Appellees,

v.

RHODE ISLAND INTERSCHOLASTIC LEAGUE, Defendant - Appellant.

On Appeal From An Order Of The United States District Court For The District Of Rhode Island

## BRIEF OF THE DEFENDANT - APPELLANT RHODE ISLAND INTERSCHOLASTIC LEAGUE

Amy B. Yarbro, Bar #1213000
ayarbro@morrisonmahoney.com
Jessica M. Savino, Bar #1211087
jsavino@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
617-439-7500
617-342-4918 FAX

Dated: August 26, 2024

## RULE 26.1(a) DISCLOSURE STATEMENT

The appellant, Rhode Island Interscholastic League (the "League") hereby makes the following disclosure pursuant to Local Rule 26.1(a): Rhode Island Interscholastic League does not have a parent company, is not a publicly-held corporation, and no individual or corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

RULE 26.1(A) DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ..................................................................... iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................... x

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES................................................................ 1

STATEMENT OF THE CASE................................................................. 2

SUMMARY OF ARGUMENT ................................................................. 6

ARGUMENT ................................................................................... 8

I. THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT DETERMINED THAT THE LEAGUE'S RULES VIOLATED THE ADA................................................................. 9

    A. THE EIGHT-SEMESTER RULE IS FACIALLY NEUTRAL. ........................... 11

    B. THE LEAGUE'S WAIVER PROCESS DOES NOT IMPOSE ADDITIONAL ELIGIBILITY CRITERIA THAT TEND TO SCREEN OUT STUDENTS WITH DISABILITIES. ....................................................................... 14

II. THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT HELD THAT WAIVER OF THE EIGHT-SEMESTER RULE WOULD BE A REASONABLE ACCOMMODATION................ 19

    A. WAIVING THE EIGHT-SEMESTER RULE WOULD FUNDAMENTALLY ALTER THE NATURE OF THE LEAGUE. .................................................. 20

    B. REQUIRING WAIVER OF THE EIGHT-SEMESTER RULE WOULD CONSTITUTE AN UNDUE HARDSHIP ON THE LEAGUE. ............................ 28

III. THE DISTRICT COURT COMMITTED CLEAR ERROR WHEN IT DETERMINED THAT THE LEAGUE VIOLATED THE ADA IN THIS CASE BY FAILING TO WAIVE THE EIGHT-SEMESTER RULE AS A REASONABLE ACCOMMODATION FOR JOHN............ 31

   A.   THERE IS NO CAUSAL CONNECTION BETWEEN THE PLAINTIFF'S
        DISABILITY AND HIS INELIGIBILITY UNDER THE EIGHT-SEMESTER
        RULE. ................................................................................................. 33

   B.   THE LEAGUE COMPLIED WITH THE ADA WHEN EVALUATING THE
        PLAINTIFFS' REQUEST FOR A WAIVER. .................................................. 39

   C.   THE DISTRICT COURT FAILED TO SHOW APPROPRIATE DEFERENCE
        WHEN REVIEWING THE LEAGUE'S DECISION TO DENY JOHN'S
        WAIVER REQUEST. .............................................................................. 40

CONCLUSION ................................................................................................. 43

CERTIFICATE OF COMPLIANCE ...................................................................... 45

CERTIFICATE OF SERVICE ............................................................................. 46

ADDENDUM ................................................................................................... 47

# TABLE OF AUTHORITIES

**CASES:**

A.H. v. Ill. High Sch. Ass'n,
  881 F.3d 587 (7th Cir. 2018).................................................................33

Alexander v. Choate,
  469 U.S. 287 (1985).........................................................................20

Aponte v. Calderon,
  284 F.3d 184 (1st Cir. 2002)............................................................8

Arredondo v. Howard Miller Clock Co.,
  No. 1:08-CV-103, 2009 WL 2871171 (W.D. Mich. Sept. 2, 2009)...................39

Baird ex rel. Baird v. Rose,
  192 F.3d 462 (4th Cir. 1999)............................................................10

Bates v. United Parcel Serv., Inc.,
  511 F.3d 974 (9th Cir. 2007)............................................................31

B.C. v. Mount Vernon Sch. Dist.,
  837 F.3d 152 (2d Cir. 2016)............................................................10

Castellano v. City of New York,
  946 F. Supp. 249 (S.D.N.Y. 1996), *aff'd*, 142 F.3d 58 (2d Cir. 1998)...............26

Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev.,
  821 F.3d 92 (1st Cir. 2016).............................................................39

Cole v. Nat'l Collegiate Athletic Ass'n,
  120 F. Supp. 2d 1060 (N.D. Ga. 2000)...............................................42

Cooter & Gel v. Hartmarx Corp.,
  496 U.S. 384 (1990).........................................................................9

C.S. v. Ohio High Sch. Athletic Ass'n,
  No. 1:14-CV-525, 2015 WL 4575217 (S.D. Ohio July 29, 2015)....................34

David v. Louisiana High Sch. Athletic Ass'n,
  244 So. 2d 292 (La. Ct. App. 1971) ....................................................40

Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.,
  804 F.3d 178 (2d Cir. 2015) ...........................................................19

Dudley v. Hannaford Bros. Co.,
  333 F.3d 299 (1st Cir. 2003) ..........................................................32

Duncan v. Walker,
  533 U.S. 167 (2001) ......................................................................17

Esso Standard Oil Co. v. Lopez-Freytes,
  522 F.3d 136 (1st Cir. 2008) ............................................................8

FDA v. Brown & Williamson Tobacco Corp.,
  529 U.S. 120 (2000) ......................................................................16

Felde v. City of San Jose,
  839 F. Supp. 708 (N.D. Cal. 1994), *aff'd*, 66 F.3d 335 (9th Cir.
  1995)..........................................................................................26

Felix v. N.Y.C. Transit Auth.,
  324 F.3d 102 (2d Cir. 2003) ............................................................25

Fulton v. Goord,
  591 F.3d 37 (2d Cir. 2009) ..............................................................28

Garcia-Ayala v. Lederle Parenterals, Inc.,
  212 F.3d 638 (1st Cir. 2000) ...........................................................13

Hebert v. Ventetuolo,
  480 A.2d 403 (R.I. 1984) .................................................................41

Henrietta D. v. Bloomberg,
  331 F.3d 261 (2d Cir. 2003)........................................................14, 33

Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,
  572 U.S. 559 (2014) ........................................................................8

Howard Univ. v. Nat'l Collegiate Athletic Ass'n,
    367 F. Supp. 926 (D.D.C. 1973), *aff'd*, 510 F.2d 213 (D.C. Cir.
    1975).............................................................................................................42

Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.,
    515 U.S. 557 (1995).............................................................................40

Hustvet v. Allina Health Sys.,
    910 F.3d 399 (8th Cir. 2018).............................................................18

J.M., Jr. v. Montana High Sch. Ass'n,
    265 Mont. 230, 875 P.2d 1026 (1994)...............................................22

Kelly v. Town of Abingdon, Vir.,
    90 F.4th 158 (4th Cir. 2024)........................................................18, 32

King v. Grand Chapter of R.I. Ord. of E. Star,
    919 A.2d 991, 995-98 (R.I. 2007)......................................................41

Leskovisek by next friend Stanley v. Illinois Dep't of Transp.,
    506 F. Supp. 3d 553 (C.D. Ill. 2020) .................................................14

Lyon v. Illinois High Sch. Ass'n,
    No. 13 C 173, 2013 WL 309205 (N.D. Ill. Jan. 25, 2013) ................7, 28, 36, 37

Malave v. Potter,
    320 F.3d 321 (2d Cir. 2003)...............................................................14

Marshall v. New York State Pub. High Sch. Athletic Ass'n, Inc,
    290 F. Supp. 3d 187 (W.D.N.Y. 2017) ...................................... *passim*

Martin v. PGA Tour, Inc.,
    994 F. Supp. 1242 (D. Or. 1998), *aff'd*, 204 F.3d 994 (9th Cir.
    2000), *aff'd*, 532 U.S. 661 (2001).....................................................23

Mary Jo C. v. N.Y. State & Local Ret. Sys.,
    707 F.3d 144 (2d Cir. 2013)..................................................20, 21, 23

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)............................................................................12

vi

McElwee v. County of Orange,
   700 F.3d 635 (2d Cir. 2012)....................................................................19

McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,
   119 F.3d 453 (6th Cir. 1997).......................................................... *passim*

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
   551 U.S. 644 (2007) ....................................................................16, 17

Nes v. Anne Arundel Cnty.,
   95 F. App'x 497 (4th Cir. 2004) ...........................................................12

Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.,
   734 F.3d 28 (1st Cir. 2013) ..........................................................40, 41

PGA Tour, Inc. v. Martin,
   532 U.S. 661 (2001) ..............................................................21, 22, 28

Pottgen v. Mo. State High Sch. Activities Ass'n,
   40 F.3d 926 (8th Cir. 1994).....................................................20, 21, 22

Powell v. Nat'l Bd. of Med. Exam'rs,
   364 F.3d 79 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir.
   2004)...........................................................................................32

Pritchard v. Fla. High Sch. Athletic Ass'n, Inc.,
   371 F. Supp. 3d 1081 (M.D. Fla. 2019).............................7, 22, 37, 38

Raytheon Co. v. Hernandez,
   540 U.S. 44 (2003) ..............................................................11, 12, 13

Reaves v. Mills,
   904 F. Supp. 120 (W.D.N.Y. 1995) ...................................................22

Reeves v. Sanderson Plumbing Prods., Inc.,
   530 U.S. 133 (2000) ............................................................................12

Rhodes v. Ohio High Sch. Athletic Ass'n,
   939 F. Supp. 584 (N.D. Ohio 1996)....................................7, 22, 35, 36

Sandison v. Michigan High Sch. Athletic Ass'n, Inc.,
   64 F.3d 1026 (6th Cir. 1995).......................................................... *passim*

Se. Cmty. Coll. v. Davis,
   442 U.S. 397 (1979) ..........................................................................20

Shelton v. NCAA,
   539 F.2d 1197 (9th Cir. 1976)..........................................................42

Starego v. New Jersey State Intersch. Athletic Ass'n,
   970 F. Supp. 2d 303, 317 (D.N.J. 2013) ............................................26

Tauscher v. Phoenix Bd. of Realtors, Inc.,
   931 F.3d 959 (9th Cir. 2019)............................................................39

United States v. Menasche,
   348 U.S. 528 (1955) ..........................................................................17

United States v. Taylor,
   487 U.S. 326 (1988) ........................................................................8, 9

US Airways, Inc. v. Barnett,
   535 U.S. 391 (2002)...............................................................25, 29, 30

Washington v. Indiana High Sch. Athletic Ass'n, Inc.,
   181 F.3d 840 (7th Cir. 1999)...............................................8, 19, 24, 34

Watson v. Fort Worth Bank & Tr.,
   487 U.S. 977 (1988) ..........................................................................14

Wisconsin Cmty. Servs., Inc. v. Milwaukee,
   465 F.3d 737 (7th Cir. 2006)..................................................14, 33, 35

**STATUTES:**

42 U.S.C. § 12131 ......................................................................9, 19, 32

42 U.S.C. § 12132 ........................................................................18, 32

42 U.S.C. § 12182 ................................................................9, 18, 19, 32

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

**REGULATIONS:**

28 C.F.R. § 35.130(b)(7).........................................................................21

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

Oral argument should be heard because the district court's ruling is contrary to precedent set by other Circuit Courts and because this case presents a novel question of law in the First Circuit.

## JURISDICTIONAL STATEMENT

The plaintiffs-appellees initiated this action in the United States District Court for the District of Rhode Island pursuant to the jurisdiction conferred by 28 U.S.C. § 1331, as it arises under the laws of the United States.

The United States Court of Appeals for the First Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, as said appeal arises from a final order of the United States District Court for the District of Rhode Island.

The district court's Order Granting Plaintiff's Motion for Permanent Injunction entered on May 28, 2024, and the appellant's notice of appeal was timely filed on June 27, 2024.

This appeal is from a final order that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that the plaintiff had succeeded on the merits for a permanent injunction when the League's eight-semester rule and waiver process comply with the Americans with Disabilities Act (the "ADA");

2. Whether the district court erred in determining that waiver of the eight-semester rule would be a reasonable accommodation despite that it would give John more opportunity to play sports than what is afforded to other students;

3.      Whether the district court erred in ignoring the decisions of both the League's waiver hearing committee, and on appeal, the Principal's Committee, by finding that John's ineligibility under the eight-semester rule was caused by his disability; and

4.      Whether the district court abused its discretion when it enjoined the League from applying the eight-semester rule to John Doe.

## STATEMENT OF THE CASE

The Rhode Island Interscholastic League is a private organization that runs and regulates interscholastic high school sports in Rhode Island. R.A. 0023. The League is comprised of principals from approximately sixty public and private schools throughout the state, and provides governance for member schools in the implementation of athletic programs. Id. To promote fairness, the League implemented the "eight-semester rule," which states that, "once a student enters the 9th grade, whether in a junior high school or a four-year high school, that student is limited to eight (8) consecutive semesters of eligibility and automatically becomes ineligible for athletic competition four years from the date of entry into the ninth grade." R.A. 0035 at § 5.B.2 [Addendum p.56]. A substantially similar, if not identical, rule is commonplace and has been upheld across the nation in other states' comparable organizations. See, e.g., McPherson v. Michigan High Sch. Athletic

Ass'n, Inc., 119 F.3d 453 (6th Cir. 1997); Pottgen v. Mo. State High Sch. Activities Ass'n, 40 F.3d 926 (8th Cir. 1994).

Plaintiff John Doe ("John") is a now-18-year-old student who will be entering his fifth year of high school in the fall of 2024. In the 2020-2021 school year, John was a freshman at a parochial school in Rhode Island and was involved in three sports. R.A. 0049 at 27:13-28:2. Due to the COVID-19 pandemic, John had a hybrid class schedule, and the athletic schedule was somewhat altered. Id. at 29:5-17; R.A. 0050 at 30:23-31:24. John maintained good grades, but he felt that he lacked social connection due to the remote learning, and he also wished to be *more* academically challenged. R.A. 0049 at 28:24-29:4; R.A. 0050 at 32:23-33:14; R.A. 0053 at 45:8-10. His parents decided to transfer him to an out-of-state boarding school known to have a more academically rigorous curriculum, and, despite his good grades at the parochial school, they decided to re-classify John as a freshman to ensure he had a "full four year-experience" at the boarding school. R.A. 0053 at 43:2-20.

While repeating his freshman year at the boarding school, John played sports throughout the entire school year – football in the fall, basketball in the winter, and lacrosse in the spring. R.A. 0054 at 46:2-6. Unfortunately, again in part due to the COVID-19 pandemic, the boarding school had "less of a social environment" than John wanted. Id. at 47:1-3. He became homesick and "frustrated," and his grades declined from As and Bs to Bs and Cs. Id. at 48:13-24; R.A. 0055 at 50:19-52:2.

When he returned home after the 2021-2022 school year, his parents considered him to be "in deep crisis" and took him for evaluation, resulting in diagnoses of depression and ADHD. <u>R.A.</u> 0056 at 55:15-56:4.

Due to John's difficulties the prior year, his parents decided that he should not return to the out-of-state boarding school and instead enrolled him in a private school in Rhode Island for his third year of high school. <u>Id.</u> at 54:17-55:11. Because he had only completed his freshman year of high school (though twice), John was classified as a sophomore at the private school. <u>R.A.</u> 0057 at 58:9-17. Given his recent ADHD diagnosis, he was also given an Individualized Support Plan ("ISP"). <u>Id.</u> at 58:1-2. Before the 2022-2023 school year began, the private school's athletic director contacted John's parents and informed them about the "eight-semester rule"; John's parents gave it little regard at the time <u>Id.</u> at 59:5-10.

During the 2022-2023 school year, John played football in the fall, and basketball in the winter (which continued into the second semester) , but did not play sports during the spring season because he was involved in other activities on which he placed a "higher priority than playing a sport." <u>R.A.</u> 0061 at 77:22-78:9; <u>R.A.</u> 0144. He did well academically and socially during both semesters. <u>R.A.</u> 0056 at 57:2-21; <u>R.A.</u> 0062 at 80:22-81:6. When he began the 2023-2024 school year, John again played football in the fall, as a starting player, and played basketball in the

winter; he did not plan to play sports during the spring season by personal choice. R.A. 0062 at 79:10-20, 81:15-22; R.A. 0145.

Before the 2023-2024 school year began, John and his parents sought a waiver of the eight-semester rule so that John would be able to play League football again during the 2024-2025 school year, his fifth year of high school. R.A. 0017. As reason for his request, John stated that he needed to play sports for the "supportive communities that motivate me to be my best self academically and socially both on and off the court/field." R.A. 0080-81. He did not aver that he had repeated his freshman year because of his disability, and did not list his desire to play sports as a motivating factor for his transfer to or from the boarding school. Id.

After review of John's application and supporting materials, and a hearing at which the plaintiffs made a presentation in support of John's request, the League waiver hearing committee unanimously denied John's request. R.A. 0020-22 [Addendum p.44-46].[1] As grounds, the committee unanimously concluded that John's ineligibility was due to his personal choice to repeat freshman year at the boarding school and not due to his disability or an undue hardship (two separate and distinct bases for waiver). Id.[2] The plaintiffs appealed the committee's decision to

---

[1] The waiver hearing committee consisted of six high school principals.

[2] The term "undue hardship" in the context of the League rules is separate and distinct from the term as it is used in an ADA analysis. Its coincidental use in the

5

the Principal's Committee on Athletics, who held another hearing and reviewed additional documentation, and the denial was unanimously upheld. R.A. 0142-45 [Addendum p.40-43].[3]

The plaintiffs filed suit on October 10, 2023, alleging that the League violated John's rights under the Americans with Disabilities Act, and moved for a preliminary injunction to enjoin the League from enforcing the eight-semester rule against John. R.A. 0007-14. By agreement, following a brief period of discovery, the parties converted the motion to one for a permanent injunction, which was heard before the Honorable William E. Smith on April 25, 2024. R.A. 0002-04; see generally R.A. 0175-0222. On May 28, 2024, Judge Smith granted the plaintiffs' motion for a permanent injunction. R.A. 0262 [Addendum p.39]. This appeal followed. R.A. 0006.

## SUMMARY OF ARGUMENT

The district court's decision to grant the plaintiffs' motion for a permanent injunction was based on errors of law and clear errors of fact, and it constituted an abuse of discretion. Most critically, the court made a significant error of law in

---

League's rules and regulations is intended to refer to certain unforeseen circumstances that may more generally provide an athlete a basis for a waiver. This distinction is discussed in Section I(B), *infra*.

[3] The Principal's Committee on Athletics consisted of six high school principals, two assistant principals, one superintendent, and one high school director of athletics.

deciding that the League's eight-semester rule and waiver process violated the Americans with Disabilities Act. Neither the eight-semester rule nor the waiver process call for disparate treatment of or have a disparate impact on students with disabilities, and the rules do not impose additional eligibility criteria that tend to screen out students with disabilities.

Moreover, waiver of the eight-semester rule is not a reasonable accommodation where a disabled student has played sports for four years, as to grant a fifth year of play would give the disabled student more than what other students are afforded under the rule. To require the League to grant a waiver in such a case would fundamentally alter the nature of the program by removing an essential element, providing some students with an unfair advantage over other students, and imposing an undue burden on the League.

Finally, the court committed clear error when it ignored the League's determination that there is no causal connection between John's disability and his eligibility under the eight-semester rule.

The district court's decision is an outlier among cases that have been decided in other jurisdictions across the United States, in which courts have concluded that the eight-semester rule does not violate the ADA. See, e.g., Rhodes v. Ohio High Sch. Ath. Ass'n, 939 F. Supp. 584, 592 (N.D. Ohio 1996); Lyon v. Ill. High Sch. Ass'n, No. 13 C 173, 2013 WL 309205, at *5 (N.D. Ill. Jan. 25, 2013); Pritchard v.

<u>Fla. High Sch. Athletic Ass'n, Inc.</u>, 371 F. Supp. 3d 1081, 1086 (M.D. Fla. 2019).

Because the district court's decision to grant the plaintiff's motion for a permanent

injunction was based on legal and factual errors, the decision was an abuse of

discretion and should be reversed.

## **ARGUMENT**

Traditionally, decisions on "questions of law" are reviewable *de novo*,

decisions on "questions of fact" are reviewable for clear error, and decisions on

"matters of discretion" are reviewable for abuse of discretion. <u>Highmark Inc. v.</u>

<u>Allcare Health Mgmt. Sys., Inc</u>., 572 U.S. 559, 563 (2014). A district court's

decision to grant a permanent injunction involves factual, legal, and discretionary

components. <u>Aponte v. Calderon</u>, 284 F.3d 184, 191 (1st Cir. 2002); <u>Washington v.</u>

<u>Indiana High Sch. Athletic Ass'n, Inc</u>., 181 F.3d 840, 845 (7th Cir. 1999) (noting

that "injunction decision involves the resolution of a number of different issues,

some of which are non-discretionary"). The scope of the injunction is reviewed for

abuse of discretion. <u>Esso Standard Oil Co. v. Lopez-Freytes</u>, 522 F.3d 136, 142 (1st

Cir. 2008).

However, "discretionary choices are not left to a court's inclination, but to its

judgment; and its judgment is to be guided by sound legal principles." <u>United States</u>

<u>v. Taylor</u>, 487 U.S. 326, 336 (1988). Thus, "a decision calling for the exercise of

judicial discretion hardly means that it is unfettered by meaningful standards or

shielded from thorough appellate review." Id. To the contrary, a district court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990); see Sandison v. Michigan High Sch. Athletic Ass'n, Inc., 64 F.3d 1026, 1030 (6th Cir. 1995) ("In determining whether the district court abused its discretion, we review the district court's findings of fact for clear error and its legal conclusions de novo. A legal or factual error may be sufficient to determine that the district court abused its discretion.").

## I.  THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT DETERMINED THAT THE LEAGUE'S RULES VIOLATED THE ADA.

Under the Americans with Disabilities Act, disabled students are entitled to "reasonable modifications to rules, policies, or practices" that prevent them from fully participating in a program, so long as the student is otherwise qualified. 42 U.S.C. § 12131(2); § 12182(2)(A)(ii). However, the ADA does not say that a disabled person can never be denied access to a program; it merely forbids that denial from being based on a disability if there is a reasonable accommodation available that would allow access.

There are two ways in which a student athlete may allege that a high school athletic association's rule or policy is discriminatory on its face: (1) by offering evidence that learning disabilities were actually considered by the high school

9

athletic association in formulating or implementing its eligibility rule (known as "disparate treatment"); or (2) by proving that the challenged rule has a "disparate impact" upon disabled students.[4] B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 158 (2d Cir. 2016). In contrast, "the application of a neutral rule that applies to disabled and nondisabled individuals alike cannot be considered discrimination on the basis of disability." Baird ex rel. Baird v. Rose, 192 F.3d 462, 468 n.6 (4th Cir. 1999)

In granting the plaintiffs' request for a permanent injunction, the district court suggested that the eight-semester rule and waiver process, or the League's application of the same, violated the ADA, and thus that John prevailed on the merits. R.A. 0250-51 at n.14 [Addendum p.27-28]; R.A. 0257 [Addendum p.34]. However, the eight-semester rule itself is facially neutral, and the waiver process does not "impose additional criteria that raises the threshold for obtaining an accommodation." R.A. 0251 at n.14 [Addendum p.28]. As such, the court's decision to grant the permanent injunction was based on an error of law and must be reversed.

---

[4] A student may also establish a claim under the ADA by showing that the high school athletic association could have reasonably accommodated his disability, but refused to do so. The district court's errors on this issue are discussed in later sections of this brief.

**A.      THE EIGHT-SEMESTER RULE IS FACIALLY NEUTRAL.**

The United States Supreme Court has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact. <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 52 (2003). "Because the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral … policy has a discriminatory impact on protected classes, courts must be careful to distinguish between these theories." <u>Id.</u> at 53.

1.      THE RULE DOES NOT CALL FOR DISPARATE TREATMENT, NOR WAS JOHN SUBJECTED TO THE SAME.

Disparate treatment "is the most easily understood type of discrimination. The [entity] simply treats some people less favorably than others *because of* their race, color, religion, sex, or other protected characteristic." <u>Raytheon</u>, 540 U.S. at 52. Liability in a disparate-treatment case depends on whether the protected trait "actually motivated" the action or policy. <u>Id.</u>

Here, there is no evidence, nor even a suggestion, that the formulation or implementation of the League's eight-semester rule (or waiver policy) has in any way "been motivated by considerations of barring students with learning disabilities from play." <u>McPherson</u>, 119 F.3d at 460. To the contrary, the League's rules specifically set forth the availability of waiver for students whose disabilities prevent them from complying with the eight-semester requirement (or other rules). <u>R. A.</u>

0029 at § 16(H) [Addendum p.60]. Furthermore, the plaintiffs conceded at oral argument that the policy was facially neutral. R.A. 0179 at 5:6.

Nor is there any evidence of disparate treatment to John specifically. In evaluating a disparate-treatment claim, a burden-shifting three-part analysis is used. First, a plaintiff must first establish a *prima facie* case of discrimination (*i.e.*, he was a qualified individual with a disability who was excluded from participation allegedly on the basis of his disability). The burden then shifts to the defendant entity to articulate a legitimate, nondiscriminatory reason for its exclusion of the plaintiff. If the defendant meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the given explanation is pretextual. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

As described later in this brief, John is not in fact a qualified individual with a disability. There is also no evidence that John's learning disability "actually motivated" the League to find him ineligible under the rules. See Raytheon, 540 U.S. at 52. As such, the plaintiff cannot get past the first stage of a disparate treatment analysis. Furthermore, his exclusion from competitive play is based on the facially neutral eight-semester rule, and there is no evidence that his denial under that rule was a "pretext" for a "subjective intent to discriminate." See id.; see also Nes v.

Anne Arundel Cnty., 95 F. App'x 497, 501 (4th Cir. 2004) (finding no disparate treatment where plaintiff was treated consistently with policy and not differently from similarly situated individuals). As such, the League's rules cannot be found to violate the ADA based on a claim of disparate treatment.

2.  THE RULE DOES NOT HAVE A DISPARATE IMPACT ON STUDENTS WITH A DISABILITY.

Disparate-impact claims involve policies "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Raytheon, 540 U.S. at 52. Under a disparate-impact theory of discrimination, "a facially neutral [policy or] practice may be deemed illegally discriminatory without evidence of the [entity]'s subjective intent to discriminate that is required in a 'disparate-treatment' case." Id. at 52-53.

In finding that the League's rules violated the ADA, the district court found that eight-semester rule had a disparate impact on disabled students and thus "conflicts with the ADA because the statute requires an entity to provide a reasonable accommodation upon a showing of a qualifying disability, not an undue hardship." R.A. 0251 at n.14 [Addendum p.28]. As an initial matter, this finding conflates two separate and distinct types of claims under the ADA. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 n.9 (1st Cir. 2000) (distinguishing prohibition on disparate impact from requirement to provide reasonable

13

accommodation); Wisconsin Cmty. Servs., Inc. v. Milwaukee, 465 F.3d 737, 753 (7th Cir. 2006) (noting that a claim of discrimination for the failure to provide a reasonable accommodation is a distinct claim from discrimination based on disparate impact); Henrietta D. v. Bloomberg, 331 F.3d 261, 277 (2d Cir. 2003) (holding same).

Furthermore, disparate impact claims require objective proof and/or statistical data that the subject class of individuals have been affected by this rule. See, e.g., Watson v. Fort Worth Bank & Tr., 487 U.S. 977, 994 (1988) (plaintiff's *prima facie* case includes "the need to show that there are statistical disparities"); Leskovisek by next friend Stanley v. Illinois Dep't of Transp., 506 F. Supp. 3d 553, 567 (C.D. Ill. 2020) (requiring objective evidence that the policy at issue causes a "relevant and statistically significant disparity"); Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003) ("[T]o make out a *prima facie* case, the statistical disparity must be sufficiently substantial to raise an inference of causation."). There is no such evidence in the record. As such, the court's finding of disparate impact was error.

B. **THE LEAGUE'S WAIVER PROCESS DOES NOT IMPOSE ADDITIONAL ELIGIBILITY CRITERIA THAT TEND TO SCREEN OUT STUDENTS WITH DISABILITIES.**

In granting the plaintiffs' request for a permanent injunction, the district court interpreted the League's waiver process as requiring both a disability and some separate hardship, which it opined violated the ADA by "impos[ing] additional

14

criteria" for a reasonable accommodation. <u>R.A.</u> 0250-51 at n.14 [Addendum p.27-28].

For students seeking a waiver on a basis other than disability, they must show that that their inability to meet the requirements of the rule is due to an "undue hardship," which is "a hardship peculiar to the student-athlete or individual caused by unforeseen events beyond the election, control, or creation of the student-athlete or individual, his/her family, or school." <u>R.A.</u> 0028 at §16(F) [Addendum p.50]. However, the League's rules allow this hardship to be *in the form* of a disability that prevents compliance with the rules. <u>R.A.</u> 0029 at § 16(H) [Addendum p.51]. That is,

> [i]n cases where a waiver of any rule is sought on the basis of disability, a waiver may be granted, as set forth above; if the student-athlete is able to show that his/her inability to meet the RIIL rules(s) is the result of a disability, and that s/he otherwise meets all of the essential requirements of participation in RIIL competition with or without a reasonable modification.

<u>Id.</u> This is entirely in line with the requirements of the ADA, and in fact the district court admits as such. <u>R.A.</u> 0250 at n.14 [Addendum p.27] ("the League's disability rule...roughly parrots the requirements of the ADA").

After setting forth the above standard of review in the context of disability, the rule continues with the procedure for making the request, as follows:

> The party making a waiver request shall state on the request form that a disability is claimed and specifically identify the disability and hardship. The party making the request shall also provide the

> Committee with all appropriate evidence documenting his/her disability and hardship, including medical evidence and any applicable IEP.

R.A. 0029 at § 16(H) [Addendum p.51]. Because the meaning of certain words or phrases "may only become evident when placed in context[, i]t is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 666 (2007) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000)). Here, two paragraphs above the disability waiver language is the standard for those students requesting a waiver *not* on the basis of a disability, which requires "circumstances constituting undue hardship…so severe that normal application of the Rule(s) is not, in the opinion of the sixty percent (60%) of the members voting, necessary to carry out the spirit or the orderly enforcement of the Rule." R.A. 0029 at at § 16(F) [Addendum p.50]. But this standard and the disability standard are in separate paragraphs for a reason – they are independent of one another.

That the League uses the single word "hardship" in its disability rule rather than the phrase "*how* that disability prevents him/her from complying with the rule for which he requests a waiver" does not mean that the League is imposing additional criteria. The district court seems to read the disability rule as saying that the student must demonstrate a disability and then also meet the undue hardship

standard – but that would bely the point of having two separate rules. When interpreting a text, it should not be read "in a way that makes part of it redundant" or reduces certain terms to "mere surplusage." Nat'l Ass'n of Home Builders, 551 U.S. at 669; Duncan v. Walker, 533 U.S. 167, 174 (2001) (it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."); United States v. Menasche, 348 U.S. 528, 538–39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.").

When the rule is read as a whole and in context, combining both the criteria and the application process and considering the separation of the disability standard from the undue hardship standard, the only reasonable interpretation is that a student may obtain a disability waiver if he or she demonstrates that (1) he or she has a disability, supported by appropriate evidence; (2) that disability has caused him or her to be ineligible under a specified rule or rules; (3) a reasonable modification of the rule(s) would make him or her eligible; and (4) he or she is otherwise qualified. This framework is entirely in line with the requirements of the ADA.

In granting the plaintiffs' motion for a permanent injunction, the district court pointed to the League's frequent use of the word "hardship" in discussing the evaluation process as further evidence that the improper standard was applied. R.A. 0236 [Addendum p.13]. However, that the League is using the word "hardship" in

this context to mean "how that disability prevents the student from complying with the rule for which he/she requests a waiver" is further supported by the decisions of the initial waiver committee and the Principals Committee. Both decisions noted that John's stated hardship *was* his learning disability, *i.e.*, he claimed that his disability caused his ineligibility. R.A. 0167 at 45:4-10; R.A. 0020-22 [Addendum p.44-46]; R.A. 0142-45 [Addendum p.40-43]. In other words, the standard is not solely whether or not a disability exists, and to the extent that the district court seems to suggest otherwise, the decision is based on an additional error of law. See R.A. 0251 at n.14 [Addendum p.28] ("the statute requires an entity to provide a reasonable accommodation upon a showing of a qualifying disability.").

Moreover, the ADA does not require an accommodation where one merely claims that the request is related to his disability; there has to be an actual relationship. § 12132 ("by reason of such disability"); § 12182 ("on the basis of disability"); see Kelly v. Town of Abingdon, Virginia, 90 F.4th 158, 167 (4th Cir. 2024) ("not every … request by a disabled [student] constitutes a request for accommodation under the ADA"). In this case, both the waiver hearing committee and the Principals Committee determined that "the accommodation []he sought did not sufficiently relate to h[is . . . ] disability." Hustvet v. Allina Health Sys., 910 F.3d 399, 411 (8th Cir. 2018); see R.A. 0020-22 [Addendum p.44-46]; R.A. 0142-45

[Addendum p.40-43]. Relatedness is not an "additional eligibility criteria"; it is the heart and soul of the analysis under the ADA and the League's own rules.

## II. THE DISTRICT COURT MADE A SIGNIFICANT ERROR OF LAW WHEN IT HELD THAT WAIVER OF THE EIGHT-SEMESTER RULE WOULD BE A REASONABLE ACCOMMODATION.

The ADA only entitles disabled students to *reasonable* modifications to rules that would otherwise prevent them from fully participating in a program *if* that student is otherwise qualified. § 12131(2); § 12182(2)(A)(ii). An entity does not need to provide an individual with a disability with every accommodation he requests or the accommodation of his or her choice. McElwee v. County of Orange, 700 F.3d 635, 641 (2d Cir. 2012). Instead, the ADA only requires an entity to provide modifications to rules, policies, or practices when the modification is a "reasonable" way to allow a disabled person to meet the essential eligibility requirements of a program. § 12131(2); § 12182(2)(A)(ii). A requested modification is not reasonable if it would impose an "undue hardship" on the operation of its program, or "fundamentally alter the nature of the service, program, or activity." Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178, 186-87 (2d Cir. 2015).

As such, whether waiver of the eight-semester rule would be a reasonable accommodation turns on whether that waiver "would generally be a fundamental alteration to the purpose of the [League's] rule or would create undue financial and administrative burdens." Washington, 181 F.3d at 850; Marshall v. New York State

Pub. High Sch. Athletic Ass'n, Inc, 290 F. Supp. 3d 187, 212 (W.D.N.Y. 2017) (waiver "would impose an undue hardship upon the administration of interscholastic high school sports programs and would threaten to fundamentally alter the nature of these competitions.").

In granting the plaintiffs' motion for a permanent injunction, the district court's decision centered on a belief that a waiver of the League's eight-semester rule would have been a reasonable accommodation. However, such a waiver would not be reasonable because it would result in a fundamental alteration of the program and impose an undue hardship on the League. John was therefore not otherwise qualified, and the district court's failure to recognize this was an error of law warranting reversal of the order.

## A. WAIVING THE EIGHT-SEMESTER RULE WOULD FUNDAMENTALLY ALTER THE NATURE OF THE LEAGUE.

An entity "need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, [though] it may be required to make 'reasonable' ones." Alexander v. Choate, 469 U.S. 287, 300 (1985). However, "[r]easonable accommodations do not require an institution 'to lower or to effect substantial modifications of standards to accommodate a handicapped person.'" Pottgen, 40 F.3d at 930 (quoting Se. Cmty. Coll. v. Davis, 442 U.S. 397, 413 (1979)).

A program's nature is "fundamentally altered" by the waiver of an "essential eligibility requirement." Mary Jo C. v. N.Y. State & Local Ret. Sys., 707 F.3d 144,

157 (2d Cir. 2013) (quoting 28 C.F.R. § 35.130(b)(7)). Whether an eligibility requirement is essential is determined by "consulting the importance of the requirement to the program in question." <u>Id</u>. The U.S. Supreme Court has identified two types of modifications that may constitute such a fundamental alteration in the athletic context: one that alters "an essential aspect of the game," and one that "gives a disabled player…an advantage over others and, for that reason, fundamentally alter[s] the character of the competition." <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 682-83 (2001).

      1.      THE EIGHT-SEMESTER RULE IS AN ESSENTIAL ASPECT OF THE LEAGUE, WAIVER OF WHICH WOULD CONSTITUTE A FUNDAMENTAL ALTERATION TO THE PROGRAM.

In applying these definitions to rules similar to the League's eight-semester rule, courts across the county have routinely found that removing an age or semester limit would fundamentally alter a high school interscholastic program, as

> An age limit helps reduce the competitive advantage flowing to teams using older athletes; protects younger athletes from harm; discourages student athletes from delaying their education to gain athletic maturity; and prevents over-zealous coaches from engaging in repeated red-shirting to gain a competitive advantage. These purposes are of immense importance in any interscholastic sports program.

<u>Pottgen</u>, 40 F.3d at 929. As the Sixth Circuit explained, there is no meaningful distinction between the nature and purpose of an age-limit rule and the eight-semester rule that could justify a conclusion that the former is "necessary" while the latter is not –

both are intended to limit the level of athletic experience and range of skills of the players in order to create a more even playing field for the competitors, to limit the size and physical maturity of high school athletes for the safety of all participants, and to afford the players who observe the age-limit rule and the eight-semester rule, presumably athletes of less maturity, a fair opportunity to compete for playing time.

McPherson, 119 F.3d at 461–62. These concerns have caused courts across the country to find that the eight-semester rule is an essential requirement of the program, the waiver of which would constitute a fundamental alteration. See, e.g., id. at 455 (vacating preliminary injunction); Sandison, 64 F.3d at 1028 (reversing grant of preliminary injunction); Pottgen, 40 F.3d at 928 (reversing grant of preliminary injunction); Reaves v. Mills, 904 F. Supp. 120, 121 (W.D.N.Y. 1995) (denying temporary restraining order); Rhodes, 939 F. Supp. at 591 (denying preliminary injunction); Pritchard, 371 F. Supp. 3d at 1088 (denying motion for preliminary injunction); J.M., Jr. v. Montana High Sch. Ass'n, 265 Mont. 230, 237, 875 P.2d 1026, 1031 (1994) (reversing injunction and noting that "limitations on maximum eligibility for participation have been generally upheld"). In fact, the U.S. Supreme Court's decision in PGA Tour, Inc. v. Martin, (on which the district court here relied heavily in issuing its ruling) ultimately affirmed the lower court's finding that:

"In Sandison and McPherson, the eligibility requirements imposed were closely fitted with the purpose of high school athletics—to allow students of the same age group to compete against each other. The learning-disabled plaintiffs who had passed beyond the age or semester limits while still remaining in high school could not compete without

fundamentally altering the nature of the services at issue. That the plaintiffs in those cases may have been less skilled athletes than their peers missed the point. High school athletics are for youths of a certain age group (14–18). Eliminating the curriculum or age-eligibility requirements for high school athletes clearly changes the fundamental nature of such competition."

Martin v. PGA Tour, Inc., 994 F. Supp. 1242, 1246 (D. Or. 1998), aff'd, 204 F.3d 994 (9th Cir. 2000), aff'd, 532 U.S. 661 (2001).

In the past ten years, RIIL has received sixty-four waiver requests, of which thirty-four were granted; the district court considered this fact as evidence that the rule was not essential. R.A. 0146-48; R.A. 0256 [Addendum p.33]. However, "determination that a rule may sometimes be waived under some circumstances does not mean that the rule, as a general matter, is not 'necessary' to the successful functioning of a sports program." McPherson, 119 F.3d at 461. Instead, the question of whether a requirement is essential must be evaluated with respect to the "importance of the requirement to the program in question," not just to the plaintiff specifically. Mary Jo C., 707 F.3d at 157.

In those cases in which waivers were granted, applicants had a significant period of absence from school that was beyond their control, which prevented them from being involved in sports during their enrollment. In contrast, John has been enrolled in school without any period of absence and has had the opportunity to play sports – and has done so – every year. Compare Sandison, 64 F.3d at 1032 (reversing injunction where "[t]hroughout the plaintiffs' first three years of high school, [the

age limit] did not bar the students from playing interscholastic sports, yet the students were of course learning disabled during those years.") with Washington, 181 F.3d at 849 (affirming injunction where "but for [the plaintiff]'s learning disability, he would not have dropped out of school").

The district court further posited that the rule could not be essential because "a student who, before enrolling in high school, spent two years in athletic training but only used a tutor without obtaining credit, would be allowed to play high school sports in Rhode Island if he were to enroll in ninth grade at fifteen or sixteen." R.A. 0255 [Addendum p.32]. However, this is incorrect – not only did the League not make any such "concession," its rules would plainly prohibit such a student from playing all four years – a student entering ninth grade at age sixteen would be barred from playing during his senior year by virtue of his age alone, while the 15-year-old would likely be barred by the "transfer rule" or by virtue of his academics.[5] See R.A. 0034 at § 4.C [Addendum p.56] (fall eligibility requires specific passing credits as of the prior June); R.A. 0035 at § 5.A [Addendum p.57] (students are ineligible for competition if their 19th birthday occurs prior to September 1st); R.A. 0036 at § 6.A [Addendum p.58] (students entering a new school without change in address are

---

[5] Not only did counsel state at the hearing that she could not "say for sure" because the judge's hypothetical scenario was "not the situation here," the court's questioning did not account for that hypothetical student's age or any other limitations on his eligibility. *R.A.* 0218 at 45:22-24.

ineligible for first 35 days of each sport in which he participated in the past 12 months). The fact that there are multiple rules in place intended to limit the length of a student athlete's eligibility further supports a finding that such a limitation is essential.

    2.    WAIVER OF THE EIGHT-SEMESTER RULE WOULD GRANT SOME STUDENTS AN UNFAIR ADVANTAGE OVER OTHERS, THEREBY FUNDAMENTALLY ALTERING THE NATURE OF COMPETITION.

The ADA's requirement for programs to provide reasonable accommodations was intended as a means of providing a level playing field, not as a way to advantage individuals with disabilities over those without. A level playing field means an opportunity to attain the *same* level of performance, or to enjoy the *same* level of benefits and privileges of employment as are available to the average similarly-situated individual without a disability. Reasonable accommodations are not intended to translate into an "unfair advantage" over those without disabilities.

> The ADA serves the important function of ensuring that people with disabilities are given the same opportunities and are able to enjoy the same benefits as other Americans. The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally.

Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003). The U.S. Supreme Court has made clear that reasonable accommodations "are needed for those with disabilities to obtain the *same*…opportunities that those without disabilities automatically enjoy." US Airways, Inc. v. Barnett, 535 U.S. 391, 397 (2002).

Congress did not intend to offer disabled students "special treatment rather than simply nondiscriminatory treatment." Castellano v. City of New York, 946 F. Supp. 249, 255 (S.D.N.Y. 1996), aff'd, 142 F.3d 58 (2d Cir. 1998) (quoting Felde v. City of San Jose, 839 F. Supp. 708, 711 (N.D. Cal. 1994), aff'd, 66 F.3d 335 (9th Cir. 1995)). In other words, denying a disabled student's request to play competitive sports for five years does not constitute disability discrimination or a violation of the ADA where that student's "four year experience . . . was not qualitatively different than students without a disability and . . . he had full access to the program." Starego v. New Jersey State Interscholastic Athletic Ass'n, 970 F. Supp. 2d 303, 317 (D.N.J. 2013) (holding that disabled student who had already participated in football for four years was not denied participation by reason of his disabilities).

Marshall v N.Y.S. Pub. High Sch. Athletic Ass'n, Inc. is instructive. There, the plaintiff's disability caused him to require more than four years of high school, and he sought a waiver under a rule nearly identical to that at issue here. Marshall, 290 F. Supp. 3d at 193-94. In denying the plaintiff's motion for a preliminary injunction, the court reasoned that a waiver would allow the plaintiff a benefit over and beyond what is contemplated by the ADA. Id. at 208. The court stated:

> Plaintiff was denied extended athletic eligibility due to a neutral rule that would have prevented him from participating in an additional year of competitive high school basketball regardless of whether he suffered a disability or not. In other words, the application of the Duration of Competition Rule would lead to the same result had one of Plaintiff's non-disabled peers sought extended eligibility after participating in four

consecutive seasons of basketball. Accordingly, Plaintiff's reasonable accommodation request does not simply seek to secure the same opportunities as his non-disabled peers; rather, this request seeks an additional benefit over and beyond what is contemplated by the ADA.

Id. at 208–09 (holding that plaintiff was "entitled to no more, nor any less" than his non-disabled peers who had completed four years of athletic competition). Here, the eight-semester rule does not prevent John from "fully and equally" enjoying four years of sports, and the rule "equally excludes" non-disabled students who have completed eight semesters of high school. Sandison, 64 F.3d at 1037.

In granting the plaintiffs' request for a permanent injunction, the district court noted that "every non-freshman makes the varsity team" and John, specifically, was "not playing a fifth year of sports to be the next Roland Steele." R.A. 0255-56 [Addendum p.32-33]. Although the district court appears to take this to mean that there would be no unfair advantage by giving John this special treatment, the plaintiffs admittedly elected to reclassify John as a freshman at the boarding school so that he would have the "benefits of having a little more maturity." See R.A. 0255 [Addendum p.32]; R.A. 0053 at 43:13-16. The plaintiffs further acknowledged that those students who are not able to be starting players are those who are "not that well developed, not ready to participate in a varsity level." R.A. 0063 at 84:19:21. Thus, it is common sense that allowing John to play, with the benefit of "a little more maturity," would necessarily take the starting place of another student who falls within the League's rules and thus has had less time to mature. Similarly, even if

John was not a starting player, each sport's limit as to how many players may be on the field at any given time necessarily means that whenever John plays, another team member does not. <u>R.A</u>. 0255 [Addendum p.32].

As such, a grant of John's waiver request would go against the fundamental purpose of both the ADA and the League's rules and regulations—to create fairness for every student-athlete. <u>See generally</u> <u>R.A.</u> 0023. This is exactly the sort of alteration that "gives a disabled player…an advantage over others and, for that reason, fundamentally alter[s] the character of the competition." <u>PGA Tour</u>, 532 U.S. at 683; <u>see</u> <u>Lyon v. Illinois High Sch. Ass'n</u>, No. 13 C 173, 2013 WL 309205, at *5 (N.D. Ill. Jan. 25, 2013) ("to allow [John to play sports] for a fifth year, despite the fact that he has already [played sports] for four years, this would in effect be granting a privilege to [John] that other students, disabled or not, do not enjoy. This belies the purpose of the ADA.").

### B. REQUIRING WAIVER OF THE EIGHT-SEMESTER RULE WOULD CONSTITUTE AN UNDUE HARDSHIP ON THE LEAGUE.

"'Reasonable' is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce. This requires a fact-specific, case-by-case inquiry, not only into the benefits of the accommodation but into its costs as well." <u>Fulton v. Goord</u>, 591 F.3d 37, 44 (2d Cir. 2009). The injunction granted by the district court essentially says that any learning-disabled students who remain in school more than eight semesters

should be able to play sports during their senior year for the "memories that will stick with" them. R.A. 0262 [Addendum p.39]. That, of course,

> would have the potential of opening floodgates for waivers, while until now, there have been only a handful of cases deemed appropriate for waivers. Assessing one or two students pales in comparison to the task of assessing a large number of students; an increase in number will both increase the cost of making the assessments, as well as increase the importance of doing so correctly. Having one student who is unfairly advantaged may be problematic, but having increasing numbers of such students obviously runs the risk of irrevocably altering the nature of high-school sports.

McPherson, 119 F.3d at 462–63; see also US Airways, 535 U.S. at 400 ("a demand for an effective accommodation could prove unreasonable because of its impact, not on [the program], but on fellow [student athletes]."); Marshall, 290 F. Supp. 3d at 212 (finding duration of competition rule non-essential "would likely open the flood gates to innumerable eligibility challenges by students who have already participated to the fullest extent permitted under the regulation").

The district court decided that in this case, John did not pose an unfair competitive advantage and that his school was not in contention for the state championship. However, that is not the point. Rhode Island public schools annually enroll approximately 1,500 students who are entitled to a Free and Appropriate Public Education (FAPE Act of 1975) due to special education under the Individuals with Disabilities in Education Act until the age of 21. All of those students are beyond their eighth semester of high school education. To require the League to

make an individualized determination of whether there is an unfair competitive advantage for a student with a disability or his school as insinuated by the district court would cause an undue burden.

This is because there are multiple factors that weigh in deciding whether an athlete possesses an unfair competitive advantage, including "chronological age, physical maturity, athletic experience, athletic skill level, and mental ability to process sports strategy." McPherson, 119 F.3d at 462. To determine whether these factors constitute an unfair competitive advantage in any particular case would require the League to not only evaluate every student individually, but then compare that student's abilities

> relative to the skill level of each participating member of opposing teams and the team as a unit. And of course each team member and the team as a unit would present a different skill level. Indeed, the determination would also have to be made relative to the skill level of the would-be athlete whom the older student displaced from the team.

Id. (holding that waiver of school's eight-semester rule would fundamentally alter the nature of the program and impose an administrative burden); Marshall, 290 F. Supp. 3d at 212 ("An individualized approach would require administrative findings upon the safety and physicality of each student applicant at the micro-level," which "would significantly weigh upon the effective administration of this program."); see also US Airways, 535 U.S. at 404 (declining to require "substitut[ion of] a complex

case-specific 'accommodation' decision" in place of "the more uniform, impersonal operation of seniority rules").

In McPherson, the plaintiff had repeated a year of high school due to his ADHD and requested a waiver of a nearly identical eight-semester rule imposed by Michigan's version of the League. Id. at 455-56. The Sixth Circuit held that requiring the League to make "these near-impossible determinations" as to whether the plaintiff had an unfair competitive advantage would constitute an undue burden and thus was not reasonable. Id. at 462. Similarly, the Sandison court found that a waiver of an age limit would not be a reasonable modification because of the "daunting task of determining whether an older student possesses an unfair competitive advantage." 64 F.3d at 1037. This is precisely what the district court here is asking the League to do. This creates an undue burden on the League and must be reversed.

III.   **THE DISTRICT COURT COMMITTED CLEAR ERROR WHEN IT DETERMINED THAT THE LEAGUE VIOLATED THE ADA IN THIS CASE BY FAILING TO WAIVE THE EIGHT-SEMESTER RULE AS A REASONABLE ACCOMMODATION FOR JOHN.**

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that he is a "qualified individual with a disability" who was excluded from participation in a program "by reason of" or "on the basis of" his disability. Bates v. United Parcel Serv., Inc., 511 F.3d 974, 988 (9th Cir. 2007). "A qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of

services or the participation in programs or activities provided by a public entity.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84–85 (2d Cir.) (quoting 42 U.S.C. § 12131(2)), opinion corrected, 511 F.3d 238 (2d Cir. 2004).

The League assumes for purposes of this case that the plaintiff is "disabled" under the law. Thus, to be a qualified individual, John must show that he meets the essential eligibility requirements for participation in the League, and if he does not, that a reasonable accommodation would allow him to do so. Here, John has already played sports for eight semesters. As explained above, the only way that John could be eligible for a fifth year of school sports would be a fundamental alteration of the program, which would impose an undue hardship on the League and thus is not reasonable.

Furthermore, "not every … request by a disabled [student] constitutes a request for accommodation under the ADA." Kelly, 90 F.4th at 167. Instead, a request only amounts to a reasonable accommodation required by the ADA where there is a causal link between the disability for which the accommodation is requested and the request itself; the standard is not simply whether or not a disability exists. § 12132 ("by reason of such disability"); § 12182 ("on the basis of disability"). It is the plaintiff's burden to establish that a requested modification would be a reasonable accommodation for his disability. Dudley v. Hannaford Bros. Co., 333 F.3d 299, 307 (1st Cir. 2003).

Here, the plaintiff cannot meet this burden – a waiver of the eight-semester rule would not be an accommodation for John's disability where his ineligibility under the rule was not *because of* his disability; it was because he had voluntarily chosen to repeat the ninth grade after it was originally disrupted by the COVID-19 pandemic. The League made precisely this finding when it denied John's request for a waiver. See R.A. 0020-22 [Addendum p.44-46]; R.A. 0142-45 [Addendum p.40-43]. As such, the district court's failure to give deference to the League's decision when granting the plaintiff's motion for permanent injunction was error.

### A. THERE IS NO CAUSAL CONNECTION BETWEEN THE PLAINTIFF'S DISABILITY AND HIS INELIGIBILITY UNDER THE EIGHT-SEMESTER RULE.

Under the ADA, "discrimination against disabled individuals is prohibited 'on the basis of' or 'by reason of' their disability." A.H. v. Ill. High Sch. Ass'n, 881 F.3d 587, 592 (7th Cir. 2018). Thus, for the plaintiff to have a viable claim against the League, he must prove "that, 'but for' his disability, he would have been able to access the services or benefits desired." Id. at 593. An accommodation is generally necessary only "when it allows the disabled to obtain benefits they ordinarily could not have by reason of their disabilities, and not because of some quality they share with the public generally." Wisconsin Cmty. Servs., 465 F.3d at 754; Henrietta D., 331 F.3d at 276 (same principle). In such a case, "an accommodation of an individual's disability operates so that the disability is overcome and the disability

no longer prevents the individual from participating." <u>Sandison</u>, 64 F.3d at 1035. As such, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability. In the context of athletics eligibility rules, a plaintiff must establish that "but for his learning disability, he would have been eligible to play sports." <u>Washington</u>, 181 F.3d at 849.

In both the waiver hearing committee's initial decision and the Principals Committee's denial of John's appeal, the League noted that John's stated hardship was his learning disability – *i.e.*, he was claiming that his disability caused his ineligibility. <u>R.A.</u> 0167 at 45:4-10; <u>R.A.</u> 0020-22 [Addendum p.44-46]; <u>R.A.</u> 0142-45 [Addendum p.40-43]. However, the ADA does not require an accommodation where one merely *claims* that the request is related to his disability; there has to actually be relationship between the disability and the requested accommodation. Here, both of the League's decisions boiled down to the fact that there was no such relationship – and where John's inability to comply with the rule was not due to his disability, waiver would not be an accommodation for that disability. <u>R.A.</u> 0020-22 [Addendum p.44-46]; <u>R.A.</u> 0142-45 [Addendum p.40-43].

Simply put, it is not his disability that prevents John from playing competitive sports in his fifth year of high school; it is the fact that he will have already completed eight semesters – in which he has already been able to participate in sports – that prevents him from meeting the eligibility requirement. <u>Cf. C.S. v. Ohio High Sch.</u>

Athletic Ass'n, No. 1:14-CV-525, 2015 WL 4575217, at *8 (S.D. Ohio July 29, 2015) (denying permanent injunction and vacating preliminary injunction where parents' choice to send disabled student to specialized school out of state did not make ineligibility "but for" student's disability). Similarly, John's inability to meet the requirements of the eight-semester rule was because of the plaintiffs' personal choice to transfer John to the boarding school and reclassify him as a freshman to ensure he had a "full four year-experience" at the boarding school. See R.A. 0053 at 43:2-20. While COVID-19's disruption of normal high-school life was unfortunate, it was a situation "share[d] with the public generally." Wisconsin Cmty. Servs., 465 F.3d at 754. That John happened to be diagnosed with a learning disorder during his high school career is not sufficient to link that disability to his inability to comply with the eight-semester rule, and the district court's determination otherwise was clear error.

Cases from other jurisdictions illustrate the clarity of this error. For example, in Rhodes v. Ohio High Sch. Ath. Ass'n, the plaintiff was an eighteen-year-old senior who had been diagnosed with ADD since the fourth grade; like John, the plaintiff went to boarding school for his freshman year, where he played football but had trouble adjusting and had an overall "unpleasant" experience. 939 F. Supp. at 586. Like the League's rule at issue here, the Ohio High School Athletic Association ("OHSAA") had a rule that a student could not play after eight semesters from

completion of eighth grade, regardless of whether the student actually participated in sports for one of the semesters. Id. In denying the plaintiff's request for a preliminary injunction, the Rhodes court found that the student "was excluded because he could not satisfy the eight consecutive semester rule, not because he was disabled." Id. at 592. The court also found that the plaintiff's repetition of his freshman year was not *solely* due to his disability – it was at best partially due to his disability and partially due to his uncomfortable setting at the boarding school. "In short, no causal connection between Plaintiff's disability and OHSAA's enforcement of its eight consecutive semester rule [was] established," and the court denied the plaintiffs' request for an injunction against the enforcement of the eight-semester rule. Id.

Similarly, in Lyon v. Ill. High Sch. Ass'n, the plaintiff was a fifth-year student who had been diagnosed with learning disabilities since grade school. No. 13 C 173, 2013 WL 309205, at *1 (N.D. Ill. Jan. 25, 2013). In the second semester of his junior year of high school, the plaintiff became academically ineligible and dropped out of school. He then *chose to attend a school that required him to repeat his junior year* due to his academics – precisely what occurred here when John chose to enroll at the Rhode Island private school as a sophomore instead of enrolling in a public school as a junior. Id. at 2. After wrestling *for four years*, he became ineligible under IHSA bylaws, which only allowed four years of competition in sports. The plaintiff

applied for a waiver of the rule, and his request was denied. Id. The court held that it was the plaintiff's participation in wrestling for four years that had made him ineligible, regardless of whether he had a disability. Id. at 5. As such, he could not establish that he would be "otherwise qualified" to participate if it were not for his disability. Id. The court reasoned that if it "were to allow [the plaintiff] to wrestle for a fifth year, despite the fact that he has already wrestled for four years, this would in effect be granting a privilege to [the plaintiff] that other students, disabled or not, do not enjoy. This belies the purpose of the ADA." Id. (denying plaintiff's motion for preliminary injunction).

In Sandison v. Michigan High School Athletic Ass'n, the Sixth Circuit reversed a similar injunction against the Michigan High School Athletic Association ("MHSAA"), Michigan's version of the League. 64 F.3d at 1037. There, the plaintiffs had been diagnosed with learning disabilities in elementary school, which eventually caused them to fall two school grades behind and ultimately become ineligible under the MHSAA's age limitation. Id. at 1029. The Sandison court held that the plaintiffs' exclusion was not based on their disabilities, but rather their age and the passage of time. Id. at 1037.

Finally, in Pritchard v. Fla. High Sch. Athletic Ass'n, Inc, the plaintiff was a fifth-year senior who had repeated the tenth grade when he transferred schools. 371 F. Supp. 3d at 1084. During his junior year, which was his fourth year of high school,

the plaintiff was diagnosed with a learning disorder. Id. at 1084. He then requested a waiver of the school's four-year limit for participation in school sports. Id. In denying the plaintiff's request for a preliminary injunction, the court explained that "plaintiff is not being excluded from participating in high school athletics 'solely because of his disability.' Rather, plaintiff is being excluded because he has already completed four consecutive years and, therefore, like every other student, he is ineligible under defendant's bylaws." Id. at 1086.

Each of these cases stands for the principle that, where the student's ineligibility was caused by a neutral rule and not by their disability, waiver of that rule was not warranted. Here, John's parents chose to reclassify him as a freshman at the boarding school so that he could have the "full experience" of high school without the interruption caused by the COVID-19 pandemic. Despite playing sports at the boarding school – the very accommodation that is claimed to benefit his mental health – John had an unpleasant experience. He then returned to Rhode Island, where he chose to attend a private school that required him to classify as a sophomore instead of a junior. John's disability never prevented him from attending school and playing sports, and he has participated in sports for the full eight semesters allowed under the rules. The court's assertion that John's disability was the cause of his ineligibility is clear error – John's ineligibility is due to the choices made by him

and his family, and to allow him a fifth year of eligibility because of those choices would fly in the face of the ADA and fundamental fairness.

**B.** **THE LEAGUE COMPLIED WITH THE ADA WHEN EVALUATING THE PLAINTIFFS' REQUEST FOR A WAIVER.**

The court in its decision appeared to suggest that the League violated the ADA by failing to engage in an "interactive process" when evaluating John's reasonable accommodation request. R.A. 0191 at 17:1-19. The court's error on this issue was primarily a factual one as the League *did* in fact engage in such a process, but the appellant also notes that the League went above and beyond what it was required to do – the text of the ADA does not contain any "interactive process" requirement; this requirement is imposed only by other statutes specific to the employment and housing contexts. Compare Castillo Condo. Ass'n v. U.S. Dep't of Hous. & Urban Dev., 821 F.3d 92, 96 (1st Cir. 2016) (HUD guidelines contemplate interactive process); Arredondo v. Howard Miller Clock Co., W.D. Mich., No. 1:08-CV-103 (Sept. 2, 2009) (EEOC regulations suggest interactive process); with Tauscher v. Phoenix Bd. of Realtors, Inc., 931 F.3d 959, 964 (9th Cir. 2019) (no interactive process requirement for public accommodations and services). This misapplication of the law necessarily means that the court's decision was an abuse of discretion.

Moreso, the court's finding is clear error, as in determining whether a student meets the criteria for a waiver based on disability, the League *does* in fact engage in an interactive process – the student submits a waiver request, the League requests

supporting documentation, and then the student and any witnesses attend a hearing with the League's waiver hearing committee where the committee asks questions to determine if the requested modification would constitute a reasonable accommodation. If the student disagrees with the board's decision, he or she can submit an appeal, with additional documentation and a second hearing before the Principals Committee. See generally R.A. 0017; R.A. 0076-108. This process was followed here, and, as described in Section I.B. above, the standard for evaluating waiver requests based on a disability is entirely in line with the ADA. Thus, to the extent that the district court's decision was based on this purported noncompliance, the court committed clear error and the decision should be reversed.

## C.  THE DISTRICT COURT FAILED TO SHOW APPROPRIATE DEFERENCE WHEN REVIEWING THE LEAGUE'S DECISION TO DENY JOHN'S WAIVER REQUEST.

Courts have long recognized the right of private associations to set their own rules and conduct their affairs free from unwarranted government interference. See, e.g., Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc., 515 U.S. 557 (1995). When reviewing decisions of voluntary membership associations, courts should show appropriate deference to those decisions, and should "not interfere with the internal affairs of a voluntary association absent mistake, fraud, collusion or arbitrariness." Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc., 734 F.3d 28, 41 (1st Cir. 2013); see David v. Louisiana High Sch. Athletic Ass'n, 244 So. 2d

292, 293–94 (La. Ct. App. 1971) (holding eight semester rule not arbitrary or unreasonable).

While this approach is not universal, both the First Circuit and Rhode Island Supreme Court give such deference to the decisions of voluntary organizations. See, e.g., Ortiz-Bonilla, 734 F.3d at 41; King v. Grand Chapt. of R.I. Ord. of E. Star, 919 A.2d 991, 995–98 (R.I. 2007). In fact, the Rhode Island Supreme Court has shown such deference to the rules of this very League:

> The league is a voluntary nonprofit association whose membership consists of school principals who chose to become members. Certainly, no principals are under any obligation to join the league. Article I of the league Rules and Regulations states as the league's purpose "to maintain, improve and raise the athletic standards in the participating schools." It has been well established that there should be no judicial interference with the internal affairs, rules and by-laws of a voluntary association unless their enforcement would be arbitrary, capricious or constitute an abuse of discretion. When such rules and by-laws are reasonable, they become binding upon the association members. Where such rules are reasonable and in keeping with public policy, there will be no judicial interference with them.

Hebert v. Ventetuolo, 480 A.2d 403, 407 (R.I. 1984) (internal citations omitted) (upholding summary judgment for defendants). In discussing the League's transfer rule, the Court in Hebert went on to hold that, as the rule was "not arbitrary or capricious on its face" and "reasonably relates to its designed purpose, the league may bind its members to it, and we will not interfere with its implementation." Id.

The district court here should have taken such an approach, as there was ample evidence that John's inability to comply with the eight-semester rule was not

41

causally related to his disability, and the League complied with the ADA when making this determination. The district court failed to recognize that the League's decision was based on its "considered judgment and experience as to the most appropriate means of furthering its legitimate goals." Howard Univ. v. Nat'l Collegiate Athletic Ass'n, 367 F. Supp. 926, 929 (D.D.C. 1973), aff'd, 510 F.2d 213 (D.C. Cir. 1975). As such, the League's "rules and decisions regarding the concerns and challenges of student-athletes are entitled to considerable deference," and it was inappropriate for the district court to take the place of the League's waiver committee "as the decision-maker on private waiver applications." Cole v. Nat'l Collegiate Athletic Ass'n, 120 F. Supp. 2d 1060, 1071–72 (N.D. Ga. 2000); see Shelton v. NCAA, 539 F.2d 1197, 1198 (9th Cir. 1976) (holding that "it is not judicial business to tell a voluntary athletic association how best to formulate or enforce its rules.").

Here, the district court not only failed to give due deference to the League's decision, it was downright dismissive – both as to the rationales for the League's eight-semester rule and the League's quasi-judicial determination of whether to make an exception for John. See, e.g. R.A. 0255-56 [Addendum p.32-33] (dismissing fairness concerns); R.A. 0228 [Addendum p.5] ("[The League's] justification?  Well, that's the rule, and rules are rules.").

# CONCLUSION

Despite the district court's penchant for the film, John Doe is not Rudy.[6] However, the district court's decision is much like that film's depiction of Coach Dan Devine – full of errors. The district court's grant of a permanent injunction was therefore an abuse of discretion, as it relied on significant errors of law and fact.

Wherefore, the League respectfully requests that this Honorable Court REVERSE the district court's order granting the plaintiffs' motion for permanent injunction.

---

[6] The district court's repeated references to the movie "Rudy" highlights the court's misapplication of the law. Rudy did not have a disability; he was an underdog football player who overcame a multitude of financial roadblocks, grade restrictions, and athletic stereotypes to earn his way to play only the two final on-field snaps in the final game of his college playing career. His eligibility for further play extinguished after that game. In contrast, John was immediately accepted as an athlete, has been a starting player on his school football team, and has enjoyed the opportunity to play sports for all eight semesters permitted under the League without restriction.

Respectfully submitted,

MORRISON MAHONEY LLP

Date: August 26, 2024

*/s/ Amy B. Yarbro*
/s/ *Jessica M. Savino*

Amy B. Yarbro, Bar #1213000
ayarbro@morrisonmahoney.com
Jessica M. Savino, Bar #1211087
jsavino@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
617-439-7500
617-342-4918 FAX

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,095 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman type.

Date: August 26, 2024        */s/ Jessica M. Savino*

Amy B. Yarbro, Bar #1213000
ayarbro@morrisonmahoney.com
Jessica M. Savino, Bar #1211087
jsavino@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
617-439-7500
617-342-4918 FAX

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica M. Savino, attorney for the defendant, hereby certify that on this date I have served the appellant's brief and addendum to counsel of record for all parties via the Court's CM/ECF filing system:

Robert Clark Corrente, Esq.
Kevin W. Stone, Jr., Esq.


Date: August 26, 2024                    /s/ *Jessica M. Savino*
                                         _____
                                         Amy B. Yarbro, Bar #1213000
                                         ayarbro@morrisonmahoney.com
                                         Jessica M. Savino, Bar #1211087
                                         jsavino@morrisonmahoney.com
                                         MORRISON MAHONEY LLP
                                         250 Summer Street
                                         Boston, MA 02210-1181
                                         617-439-7500
                                         617-342-4918 FAX

# **ADDENDUM**

Local Rule 28.0(a)(1) Contents:

    Memorandum and Order of Hon. William E. Smith, dated May 28, 2024 .......... 1

    League Appeal Decision, dated September 12, 2023 ....................................... 40

    League Decision, dated April 28, 2023 ............................................................. 44

Local Rule 28(a)(2) Contents:

    League Rules and Regulations, Article I, The Organization ............................. 47

    League Rules and Regulations, Article III, Eligibility ...................................... 52

    League Rules and Regulations, Article VIII, Appeals ...................................... 62

Fed. R. App. P. 28(f) Contents:

    42 U.S.C. § 12131 ............................................................................................ 64

    42 U.S.C. § 12132 ............................................................................................ 65

    42 U.S.C. § 12182 ............................................................................................ 66

    28 C.F.R. § 35.130(b)(7) .................................................................................. 70

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                                    )
JAMES DOE and JANE DOE,                              )
Individually, and as Natural                         )
Parents and Next Friends of                          )
JOHN DOE,                                            )
                                                    )
            Plaintiffs,                              )
                                                    )
     v.                                              )    C.A. No. 23-414 WES
                                                    )
RHODE ISLAND INTERSCHOLASTIC                         )
LEAGUE,                                              )
                                                    )
            Defendant.                               )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

Youth in this country are experiencing a mental health crisis.[1] The rates of depression and anxiety among teens have skyrocketed, along with the rates of teens considering and committing suicide.[2] Research suggests that these alarming trends

_____

[1] The crisis among children and teens has become so severe that the American Academy of Pediatrics has declared it a national emergency. Erica Pandey, The State of the Teen Mental Health Crisis — and How to Help, Axios (last updated May 14, 2022), https://www.axios.com/2022/05/10/kids-teen-mental-health-crisis-parents-teachers-how-to-help.

[2] Erica Pandey, Screens Are Poisoning Kids' Minds, Axios (Mar. 22, 2024), https://www.axios.com/2024/03/22/screen-time-bad-unhealthy-kids-mental-health?utm_source=newsletter&utm_medium=email&utm_campaign=newsletter_axiosam&stream=top (identifying studies describing how the rate of anxiety and depression among teens has increased by more than 50% from 2010 to 2019; the suicide rate for children between the ages of 10 and 14 has tripled between 2007 and 2021; and the

stem from the increased use of phones and social media among teens and the declining rates of teens spending time with friends in person.[3]  Though such trends existed in the years leading up to the COVID-19 pandemic,[4] the calamities of the pandemic only served to catalyze them.[5]

Extracurriculars can serve as a remedy to these damaging trends in teen mental health.  One study examined the mental health of students during the COVID-19 pandemic and found a correlation between students' participation in extracurricular activities and lower rates of anxiety, inattention, hyperactivity, and depressive symptoms.[6]  These results reflect previous research finding an

---

rate of high school girls considering suicide increased from 19% in 2011 to 30% in 2021).

[3] Id. (noting a study finding that high school kids on average saw friends in person 3 times a week during the early 2000s, but only 1.5 times a week today); Christine Mehta, Why Today's Youth are 'The Anxious Generation', Bos. Globe (last updated Mar. 24, 2024), https://www.bostonglobe.com/2024/03/24/opinion/jonathan-haidt-the-anxious-generation/?p1=BGSearch_Advanced_Results (similarly noting how teens on average spend only 30-60 minutes a day in person with friends, which is down from two hours before 2010).

[4] Jen Rose Smith, Are the Kids All Right? Supporting Your Teen's Mental Health Through COVID-19, CNN (republished Oct. 8, 2020), https://www.cnn.com/2020/10/08/health/teen-mental-health-pandemic-wellness/index.html (referencing a 2019 study).

[5] See Moriah Balingit, 'A Cry for Help': CDC Warns of a Steep Decline in Teen Mental Health, Wash. Post (Mar. 31, 2022), https://www.washingtonpost.com/education/2022/03/31/student-mental-health-decline-cdc/.

[6] Kaitlyn LaForge-MacKenzie, et al., Participating in Extracurricular Activities and School Sports During the COVID-19 Pandemic: Associations With Child and Youth Mental Health, Front

2

association between participating in sports and positive post-high school mental health outcomes.[7]  Participation in team sports in particular is associated with overall psychological well-being.[8]

The plaintiff here, John Doe, is like many of his generation. He experienced some of high school on a screen at the height of the pandemic.  His parents, James and Jane Doe, wanted better. After spending a year at a parochial school where there was remote learning, John's parents enrolled him in an out-of-state boarding school – where he would repeat freshman year - with the hope that he would have a better academic experience and forge in-person social connections with other students of his age.  Unfortunately, his experience did not pan out as John's parents had hoped.  While in boarding school, John's academic performance and social and physical health took a steep decline.  That summer, John was diagnosed with anxiety, depression, and Attention- Deficit /

_____

Sports         Act         Living       (Aug.         29,         2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9464933/;            Eva Oberle, et al., <u>Screen Time and Extracurricular Activities as Risk and Protective Factors for Mental Health in Adolescence: A Population-Level Study</u>, Preventative Medicine 3-6 (Dec. 2020).

[7] Rachel Jewett, et al., <u>School Sport Participation During Adolescence and Mental Health in Early Adulthood</u>, J. of Adolescent Health 642-43 (2014).

[8] <u>See generally</u> Narelle Eather, et al., <u>The Impact of Sports Participation on Mental Health and Social Outcomes in Adults: A Systematic Review and the 'Mental Health Through Sport' Conceptual Model</u>, Systematic Reviews (2023) (providing a comprehensive review of studies confirming the association between playing team sports and improved mental health).

3

Hyperactivity Disorder ("ADHD"), among other learning disabilities. As part of John's treatment, doctors recommended he get involved in sports. After John returned to Rhode Island and enrolled in a private school, he did just that. By all accounts, his time playing competitive football and basketball made a real positive impact on his mental health and overall well-being.

John will be a senior next year and wants to continue playing on his respective teams. The only problem, however, is that the Rhode Island Interscholastic League ("RIIL" or the "League") – the organization that administers competitive sports in the state – has an Eight-Semester Rule (the "Rule"). Under the Rule, a student becomes automatically ineligible to play competitive sports eight semesters from when he enrolls in ninth grade. John will be enrolled in his ninth and tenth semesters of high school next year because he repeated freshman year at the boarding school.

Despite the mental health crisis that has afflicted John and other students in this state and across the country, as well as the universally recognized benefits of participation in high school sports,[9] the League put its foot down and denied John's

---

[9] DXD, RIIL Mission Statement, ECF No. 11-2 ("Athletic competition is a major component [of] education. . . . Research indicates that student-athletes have better grades than non-athletes and that student-athletes have higher attendance rates and higher graduation rates than non-participants.").

request for a waiver of the Rule.  It avers that he is not entitled to a waiver as he did not repeat freshman year <u>because of</u> his learning disabilities.  Rather, it was his parents' personal decision to have John repeat his freshman year.

Instead of having John be fully part of a team, the League wants John to sit on the sidelines, despite the demonstrably profound benefits that extracurriculars, like team sports, have on students' mental health.  The League insists that the Rule applies even though there is no evidence in the record suggesting John's playing would give him or his team an unfair advantage or would pose a risk to other students' safety, or otherwise adversely affect other players or teams in any way.  Their justification?  Well, that's the rule, and rules are rules.[10]

---

[10]    It is curious why competitive high school sports have become such an elevated extracurricular activity.  Had John wanted to participate in art club, marching band, mock trial, debate club, or service club during his ninth and tenth semesters, it is highly doubtful that there would be a challenge to his participation.  Conflicts, like this one, only arise in the context of athletics. <u>See, e.g.</u>, <u>Doe v. Horne</u>, No. CV-23-00185-TUC-JGZ, 2023 WL 4661831, at *22 (D. Ariz. July 20, 2023) (granting preliminary injunction that would allow two transgender female students to participate in interscholastic sports); <u>D.M. v. Or. Scholastic Activities Ass'n</u>, No. 6:22-cv-01228-MC, 2022 WL 17104604, at *4 (D. Or. Nov. 22, 2022) (denying preliminary injunction in case where students sought waiver of eight-semester rule because of mental disabilities); <u>Jones as next friend of Jimmy v. Mass. Interscholastic Athletic Ass'n</u>, No. 22-CV-11426-AK, 2022 WL 6819608, at *8 (D. Mass. Oct. 1, 2022) (denying preliminary injunction over whether virtual students could participate in athletics at their local brick-and-mortar schools).  Perhaps it is because youth sports have become a $15-billion-a-year industry that requires parents to devote significant time, resources, and

As the Court explains below, John's learning disabilities caused his ineligibility under the Rule and his request for a waiver of the Rule is a reasonable accommodation. The evidence in the record convinces the Court that the Rule should not apply here. Other equitable considerations further convince the Court that the Rule should not apply.

John is not an all-star and his school's athletics program is not positioned to win a state championship. It's simple: John wants to be part of a team during his senior year of high school. Like Daniel Ruettiger in the beloved film Rudy, John wants the memory of playing on the field (or court) with his teammates.[11] He is not trying to be the best, take someone else's place, or gain an unfair advantage. He just wants to play. For that and the reasons below, the Court GRANTS John's Motion for a Permanent Injunction, ECF No. 6.

---

energy. See Linda Flanagan, The Downsides of Having an Athlete in the Family, The Atlantic (Aug. 3, 2022); Randi Mazzella, Overzealous Parents are Ruining Youth Sports. It's Past Time to Sit Quiet and Let the Kids Play., Wash. Post (Mar 2, 2022), https://www.washingtonpost.com/lifestyle/2020/03/02/overzealous-parents-are-ruining-youth-sports-heres-how-do-better/. At their root, team sports are no different than any other extracurricular. Sports, like other school-sanctioned activities, give students an outlet to socialize, be part of a community, and use their creativity. This appears to have been forgotten in the world of high school athletics.

[11] Rudy (Sony Pictures Entertainment 1993).

# I.   BACKGROUND

## A. John's Academic History

In the fall of 2020, John enrolled in a Rhode Island parochial school as a freshman.  Verified Compl. ("VC") ¶ 6, ECF No. 1.  Like much of the country at the time, the school had transitioned to remote learning because of the COVID-19 pandemic.  Id.; DXB, James Doe Dep. (Jan. 10, 2024) ("James Dep.") 28-29, ECF No. 11-2.  The pandemic also prevented John – who is involved in competitive football and basketball – from playing interscholastic sports during the fall semester of his freshman year.  VC ¶ 6; James Dep. at 30-31.  Instead, students played fall-semester sports during the spring semester.  VC ¶ 6; James Dep. at 30-31.  John ended his first freshman year with a grade point average of 89.0 out of 100.  DXC, John's Boarding School Application (Jan. 15, 2021) ("Application") 47, ECF No. 11-2.

John's parents believed there was a "disconnect" between his intellect and his academic performance.  James Dep. at 28-29.  Consequently, John's parents transferred him to an out-of-state boarding school to benefit from a smaller, more structured environment and opted for him to repeat his freshmen year during the 2021-22 school year.  VC ¶ 7; James Dep. at 37.  His parents believed the boarding school would have a connected community, smaller learning environment, and rigorous academic curriculum.  James Dep. 39-42.  John's parents, based on advice they had

7

received, had him repeat freshman year to get the "full four-year experience" and benefit from more maturity. Id. at 43-44. At the time of his transfer, John had not been formally diagnosed with any learning disabilities. VC ¶ 7.

John's time at the boarding school, however, only exasperated the disconnect his parents perceived. He struggled academically, did not connect with his peers, and did not receive the individualized support that his parents had expected, though he did play competitive sports during that time. James Dep. at 46-48; DXD, Evaluation Report (Aug. 2022) 94-95, ECF No. 11-2; DXD, John Doe Ltr. (Mar. 2023) 85-86, ECF No. 11-2; DXD, James and Jane Doe Ltr. (Mar. 2023) ("Parents' Ltr.") 87-88, ECF No. 11-2. John received grades equivalent to a B+, C+, B+, and B. Application at 47. John became depressed, lost significant weight, and returned home after the 2021-22 school year. James Dep. at 46-48, 53-55; Parents' Ltr. at 87-88. Subsequently, during the summer of 2022, John's pediatrician and psychiatrist formally diagnosed him with certain learning disabilities including ADHD, anxiety, and major depressive disorder, and identified writing and reading impairments. VC ¶ 9; James Dep. at 53-57; Parents' Ltr. at 88. John's pediatrician prescribed medication and regular therapy sessions. James Dep. at 55-57. John also received advice to continue participating in competitive sports. VC ¶ 11; James Dep. at 69-70.

8

Add. 008

John enrolled at a Rhode Island private school as a sophomore for the 2022-23 school year where he received academic accommodations, an individualized learning plan, and other support to address his learning disabilities. James Dep. at 57-58, 68-69. He also participated in competitive sports. Id. at 57-58; DXD, Attorney Ltr. 83, ECF No. 11-2; DXD, John Ltr. 85-86, ECF No. 11-2. John's condition improved, in part, because of his participation in sports. VC ¶ 12; James Dep. at 57-58; Parents' Ltr. at 88. According to John's father, John is "thriving" and has experienced academic, social, physical, and psychological improvements. James Dep. at 57-58. John is currently a junior at the private school for the 2023-24 school year and will enroll at the school for his senior year. VC ¶ 13. Over the past two years, John has been on the varsity football and basketball teams and would like to continue his involvement next academic year. Id.; James Dep. at 80.

## B. RIIL and the Eight-Semester Rule

RIIL is a non-profit organization that administers, regulates, and supervises competitive high school sports in Rhode Island. VC ¶ 3; DXE, RIIL Mission Statement 115, ECF No. 11-2; DXG, RIIL Rules and Regulations ("RIIL R&R") art. 1, § 2, ECF No. 11-2. The League counts seventy-two schools as its members, including public, private, and parochial schools, all of which pay membership dues so their students can participate in competitive

9

sports.   See VC ¶ 3; RIIL Mission Statement at 115; DXL, Michael Lunney Dep. (Jan. 18, 2024) ("Lunney Dep.") 10, ECF No. 11-2; RIIL R&R art. 1, § 13.   The League is governed by the Principals' Committee on Athletics, which is composed of principals and assistant principals from member schools.   RIIL R&R art. 1, § 2; see Lunney Dep. at 10.

The Eight-Semester Rule is articulated under Article III, Section (5)(B)(2) of the League's Rules and Regulations, which limits a student's eligibility to play competitive sports to eight consecutive semesters from the time the student first becomes a high school freshman.   VC ¶ 21; Lunney Dep. at 21.   A student is automatically ineligible for athletic competition four years from the date of entry into ninth grade.   Students may seek a waiver of the Rule.   See RIIL R&R art. 1, § 16.   A waiver, however, is "exceptional and extraordinary relief."[12]   Id. § 16(F).

The waiver process begins when a student submits a Waiver Request Form that includes accompanying documents such as transcripts, letters of support, medical documents, and documents relating to a student's individualized education plan.   Id. § 16(A)-(B).   The request is then reviewed by the Waiver Request Hearing Committee ("Waiver Committee"), which is composed of

---

[12]   Over the past 10 years, RIIL has granted 34 waivers of the Eight-Semester Rule out of the 64 requests that it has received. DXJ, Interrogatories of "8 Semester" Waivers Granted 146, ECF No. 11-2.

principals of member schools. Id. § 16(D). A student seeking a waiver on the basis of an undue hardship bears the burden of

> convinc[ing] sixty percent (60%) of the [Waiver] Committee present and voting of the extenuating circumstances constituting undue hardship. Undue hardship means a hardship peculiar to the student-athlete or individual caused by unforeseen events beyond the election, control or creation of the student-athlete or individual, his/her family, or school. The Committee interprets undue hardship particular to the situation of the individual which is so severe that normal application of the Rule(s) is not . . . necessary to carry out the spirit or the orderly enforcement of the Rule.

Id. § 16(F) (the "undue hardship standard"). Those seeking a waiver on the basis of a disability must

> show that his/her inability to meet the RIIL rule(s) is the result of a disability, and that s/he otherwise meets all of the essential requirements of participation in RIIL competition with or without a reasonable modification. The party making a waiver request shall state on the request form that a disability is claimed and specifically identify the disability and hardship. The party making the request shall also provide the Committee with all appropriate evidence documenting his/her disability and hardship, including medical evidence and any applicable [individualized education plan].

Id. § 16(H) (the "disability standard").

### C. RIIL Denies John's Waiver Request

John applied for a waiver of the Rule in March 2023. Ex. A VC, RIIL Waiver Request Form (Mar. 2023), ECF No. 1-1. The League's Waiver Committee reviewed his application and held a hearing in April 2023. See Ex. B VC, Waiver Hearing Committee Decision (Apr. 27, 2023) ("RIIL Decision"), ECF No. 1-2. In his

application, John asserted that he needed to play competitive sports for a fifth year to, among other reasons, maintain his positive self-esteem, emotional well-being, and his ability to engage in the classroom. Attorney Ltr. at 84. The application also described the challenges he faced while he was enrolled in the boarding school. Id. at 82-83; Evaluation Report at 94-95. Attached to the application were letters of support from his parents, psychiatrist, and family attorney. The Waiver Committee heard testimony from John, his parents, the private school's athletic director, and his family attorney. See RIIL Decision 1.

The Waiver Committee unanimously denied John's request, which the League's Principals' Committee on Athletics unanimously upheld on appeal. Id. at 4; VC ¶ 19; DXH, Principals' Committee on Athletics Decision (Aug. 24, 2023) ("Principals' Decision") 138-41, ECF No. 11-2; see also RIIL R&R art. 1, § 16(E) (outlining process to appeal Waiver Committee decisions). In its decision, the Waiver Committee reasoned that it was John's parents' "personal choice" to have John transfer to the boarding school and re-classify as a freshman despite receiving good grades while enrolled in the parochial school. RIIL Decision at 2. It also noted that John transferred to the boarding school because he did not receive enough academic support at the parochial school. Id. Moreover, it found that, by the time he becomes a senior, he would have played eight semesters of sports. See id. at 2-3.

Because the Waiver Committee concluded that John's ineligibility was not caused by his disability, it applied the undue hardship standard rather than the disability standard. <u>Id.</u> at 3; Lunney Dep. at 65-66. Though the Waiver Committee did not apply the disability standard, it nonetheless considered John's learning disability in its calculus. <u>See</u> Lunney Dep. at 66. Consequently, the Waiver Committee did not make any findings concerning whether a waiver would be a reasonable accommodation for John or would fundamentally alter the nature of athletic competition among member schools.

A few months after the Principals' Committee upheld the denial, John filed this lawsuit, alleging that RIIL violated his rights under the Americans with Disabilities Act as applied, and moved for a preliminary injunction. <u>See generally</u> VC; Mot. Prelim. Inj., ECF No. 6. Following a conference, the parties agreed to engage in a brief, 60-day period of discovery rather than conduct an evidentiary hearing. Text Order (Oct. 23, 2024). By agreement, the parties converted the motion to one for a permanent injunction. <u>See</u> Suppl. Mem. Supp. Mot. Inj. Relief ("Pl. Mem.") 1 n.1, ECF No. 10; Def.'s Mem. Law Supp. Opp'n ("Def. Mem.") 1, ECF No. 11-1. The Court granted leave to Disability Rights of Rhode Island ("DRRI") to file an amicus brief in support of John. Text Order (Apr. 23, 2024); <u>see</u> DRRI Br. Amicus Curiae, ECF No. 15. The Court

13

Add. 013

held a hearing on the merits – as provided for by the parties' agreement – on April 25, 2024.

## II.   STANDARD OF REVIEW

To obtain a permanent injunction, the plaintiff must first make a showing of "actual success" on the merits, and not "only a showing of likelihood of success on the merits" as is required for a preliminary injunction.   NACM-N.E., Inc. v. Nat'l Ass'n of Credit Mgmt., Inc., 927 F.3d 1, 4 (1st Cir. 2019); see Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987).  Second, the plaintiff must show four additional factors:

> (1) that it has suffered [or will suffer] an irreparable injury [absent injunctive relief]; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); see United States v. Mass. Water Res. Auth., 256 F.3d 36, 50 n.15 (1st Cir. 2001).

## III.   DISCUSSION

Of the factors above, the parties do not dispute that there are no other remedies at law that would adequately compensate John for his future injury.  At its core, John wants to play competitive sports during his senior year.  Other remedies, such as monetary damages, would not address the impending harm of being denied the

14

right to play sports. Only an injunction preventing the application of the Rule would make John whole. Thus, this factor for a permanent injunction is met. The Court will address the other disputed factors in turn.

## A. Actual Success on the Merits

John alleges the League violated Titles II and III of the ADA as applied by denying him a waiver. "[T]he ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001) (footnotes omitted). "Congress enacted the ADA 'to address the major areas of discrimination faced day-to-day by people with disabilities,' hoping 'to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals.'" Dudley v. Hannaford Bros. Co., 333 F.3d 299, 303 (1st Cir. 2003) (citations omitted) (first quoting 42 U.S.C. § 12101(b)(4); and then quoting id. § (a)(8)).

Title II of the ADA "prohibits discrimination against persons with disabilities by 'public entities.'" Parker v. Universidad de P.R., 225 F.3d 1, 4 (1st Cir. 2000) (quoting 42 U.S.C. § 12132). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute defines a "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Id. § 12131(2).

To succeed on a Title II claim, a plaintiff must establish "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability."  Parker, 225 F.3d at 5; see 42 U.S.C. § 12132.

Likewise, Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a); see Dudley, 333 F.3d at 303 ("[Title III] sends a bluntly worded message . . . : you may not discriminate against an individual in the full and equal access to goods and services on the basis of a disability.").  The statute

also stipulates that "a failure to make reasonable modifications . . . when such modifications are necessary" is discrimination unless the entity in question can show that "such modifications would fundamentally alter the nature" of the program. 42 U.S.C. § 12182(b)(2)(A)(ii).

> To succeed on a Title III claim,
>
> the plaintiff must show that [1] the defendant has a discriminatory policy or practice in effect; [2] that he (the plaintiff) requested a reasonable modification of that policy which, if granted, would have afforded him access to the desired goods[, services, facilities, privileges, advantages, or accommodations]; [3] that the requested modification – or a modification like it – was necessary to afford that access; and [4] that the defendant nonetheless refused to modify the policy or practice.

Dudley, 333 F.3d at 307 (citing Martin, 532 U.S. at 663 n.38; Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999); and Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1058-60 (5th Cir. 1997)). Once the plaintiff bears his burden of establishing a reasonable accommodation, the burden shifts to the defendant to show that such a modification would lead to a "fundamental alteration" of the policy or practice. Massachusetts v. E*Trade Access, Inc., 464 F. Supp. 2d 52, 58 (D. Mass. 2006); see Dudley, 333 F.3d at 307-08 (elaborating that, once a reasonable modification is found, the defendant must implement it unless "doing so would alter the fundamental nature of its business, or

17

Add. 017

that the requested modification poses a direct threat to the health or safety of others" (citations omitted)).

Here, there is no disagreement that John's learning impairments qualify as a disability under the ADA. The parties instead dispute whether the ADA applies to RIIL; whether there is a causal connection between John's disability and his ineligibility to play competitive sports; and whether John sought a reasonable accommodation.

1. Whether Title II Applies to RIIL

Preliminarily, the Court must determine whether Title II and III of the ADA apply to the League. See Dudley, 333 F.3d at 307. In short, the answer is yes. The League concedes that Title III applies but disputes whether Title II applies. See Def. Mem. 8; Def.'s Reply Br. DRRI's Br. Amicus Curie 4, ECF No. 16.

Title II covers public entities, which are "ant State or local government . . . . [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B). RIIL argues that Title II does not apply to it because it is not a "public entity"; it is a voluntary, private, incorporated non-profit association that does not receive any state funding. Def. Mem. 8.

John argues that RIIL is an "instrumentality of the state" and is, thus, a "public entity" under the ADA. Pl. Mem. 24-25. In support, he relies on Dennin v. Connecticut Interscholastic

18

Add. 018

Athletic Conference, Inc., which found that Connecticut's version of RIIL – the Connecticut Interscholastic Athletic Conference ("CIAC") – was an "instrumentality of a State." 913 F. Supp. 663, 670 (D. Conn. 1996), appeal dismissed, vacated as moot, 94 F.3d 96 (2d Cir. 1996). There, the court placed significant weight on the fact that public schools both "delegate authority to CIAC to direct and control their athletic programs" and play a role in enforcing CIAC's policies. Id. In addition to these considerations, the court in Pottgen v. Missouri State High School Activities Ass'n emphasized that the state's athletic governing body (the MSHSAA) received funding from member schools. 857 F. Supp. 654, 661–62 (E.D. Mo. 1994), rev'd on other grounds, 40 F.3d 926 (8th Cir. 1991). The reasoning in Dennin and Pottgen is consistent with how other courts view the role of athletic governing bodies. See, e.g., Isler v. N.M. Activities Ass'n, 893 F. Supp. 2d 1145, 1155 (D.N.M. 2012) (collecting cases), rev'd on other grounds, No. 10-CV-009 MV/WPL, 2013 WL 12328907 (D.N.M. Sept. 25, 2013); Sandison v. Mich. High Sch. Athletic Ass'n, 863 F. Supp. 483, 487 (E.D. Mich. 1994), dismissed in part, rev'd in part, on other grounds, 64 F.3d 1026 (6th Cir. 1995) ("MHSAA is clearly an agency or other instrumentality of the state.").

Like the CIAC, MSHSAA, and MHSAA, RIIL is an "instrumentality of the state," and thus a "public entity" for purposes of Title III. RIIL serves as the managing authority for interscholastic

19

athletics in Rhode Island.  Member schools – a majority of which are public – delegate their authority to RIIL and allow it to use their facilities to host events and competitions.  RIIL's very own description supports the proposition that RIIL is an instrumentality of the state: "[RIIL] is a voluntary organization of <u>principals who pledge their high schools</u> and participants to follow the Rules and Regulations of the League. . . . The purpose of the [RIIL] is to <u>supervise and administer the athletic programs</u>, contests, and schedules and matters related thereto in <u>participating schools of the State of Rhode Island</u>."  RIIL Mission Statement 1 (emphasis added).  Though it does not receive funding directly from the state, it is mostly funded by the "membership dues and fees" from public schools.  <u>Id.</u>  Moreover, the governing bodies within RIIL are made up of principals and assistant principals, many of whom work for public school departments.  <u>Id.</u>; <u>see also</u> RIIL Decision at 2 (identifying members of Waiver Committee during John's hearing, all of whom are principals of public schools); Principals' Decision at 138 (reflecting that nine of the ten principals on the Principals' Committee on Athletics during John's hearing are employed at public schools).  Taken together, these facts convince the Court that RIIL is covered by Title II as a "public entity."

2. Whether John's Disability Caused His Exclusion

The League argues that John's disability did not cause his exclusion from competitive sports. Def. Mem. 10-12. Under Title II, a public entity is liable for disability discrimination if it excludes someone "by reason of [his or her] disability." 42 U.S.C. § 12132. This language requires a causal link between the plaintiff's disability and the defendant's discriminatory action. See Turner v. U.S. Postal Serv., No. 23-10752-MPK, 2023 WL 6448511, at *3 (D. Mass. July 28, 2023); Lewis v. Spurwink Servs., Inc., No. 2:22-cv-00054-NT, 2022 WL 17454078, at *4 (D. Me. Dec. 6, 2022); accord Washington v. Ind. High Sch. Athletic Ass'n, 181 F.3d 840, 848-49 (7th Cir. 1999); Starego v. N.J. State Interscholastic Athletic Ass'n, 970 F. Supp. 2d 303, 314 (D.N.J. 2013). Similarly, Title III imposes liability if the defendant discriminates against someone "on the basis of disability." 42 U.S.C. § 12182(a).

Several courts have had the opportunity to examine the extent to which there is a causal connection between a student's exclusion by an age-eligibility rule and his disability. RIIL heavily relies on the Sixth Circuit's decision in Sandison v. Michigan High School Athletic Ass'n. There, the plaintiff students stayed backed a year because of their learning disabilities and, as a result, were barred from participating by the MHSAA's rule prohibiting students who turn nineteen on or after September 1 from playing. Sandison,

21

64 F.3d at 1028.  The MHSAA did not allow waivers of the rule.
Id. at 1029.  In reversing the preliminary injunction enjoining
the MHSAA from preventing the students from playing, the Sixth
Circuit reasoned that the plaintiffs' exclusion was a result of
their age, not disability.  Id. at 1032, 1036.  In other words,
their disabilities were not what caused the plaintiffs'
ineligibility, but rather it was the "passage of time."  Id. at
1031-33.  The Sandison court found MHSAA's age-eligibility rule to
be "neutral" in that it only applies when a student turns nineteen
and is agnostic to a student's disability.  Id. at 1033.  This
reasoning led the court to conclude that the students' exclusion
was not "by reason of" or "on the basis of" the plaintiffs'
respective disabilities.[13]  Id.

John principally relies on two cases.  First, he relies on
Dennin, which involved a nineteen-year-old student with Down
Syndrome who received special education and completed middle
school in four years rather than three.  913 F. Supp. at 666.  The

---

[13] RIIL also relies on Rhodes v. Ohio High School Athletic
Ass'n, 939 F. Supp. 584 (N.D. Ohio 1996) which applied the
reasoning of Sandison v. Michigan High School Athletic
Association, 64 F.3d 1026 (6th Cir. 1995).  See Def.'s Mem. Law
Supp. Opp'n 11-12, ECF No. 11-1.  The court in Rhodes found that
the application of an eight-semester rule to a learning-disabled
student, who had stayed back a year at a different school, did not
constitute disability discrimination.  939 F. Supp. at 586-87,
592.  The court further found that the plaintiff did not repeat
freshman year only because of his disability, but also because he
had an unpleasant and inadequate education at his original school.
Id. at 592.

CIAC enforced a rule stating that students who turn nineteen on or after September 1 cannot play competitively. <u>Id.</u> The court enjoined the CIAC from applying its age-eligibility rule. <u>Id.</u> at 671. It reasoned that but for the plaintiff's disability, he would qualify under the age-eligibility rule. <u>Id.</u> at 669-71. The challenges related to the student's disability caused him to take longer to complete middle school, which made him ineligible under the CIAC's age-eligibility rule as a senior. <u>See id.</u>

Second, John relies on <u>Washington v. Indiana High School Athletic Ass'n</u>, a Seventh Circuit case that involved a learning-disabled student who dropped out after his tenth-grade year because of his academic struggles. 181 F.3d at 842. After dropping out, the plaintiff took a test that revealed he was learning disabled. <u>Id.</u> When he returned to the school, the plaintiff wanted to play on the school's basketball team. <u>Id.</u> Like the RIIL, the Indiana High School Athletic Association ("IHSAA") had an eight-semester rule and denied the plaintiff's request for a waiver. <u>Id.</u> at 842-43. Like in <u>Dennin</u>, the Seventh Circuit rejected <u>Sandison</u>'s "passage of time" reasoning and affirmed the preliminary injunction enjoining the IHSAA, articulating that it was the plaintiff's disability that caused him to violate the rule. <u>See id.</u> at 848-49, 854. Had the plaintiff not dropped out because of difficulties associated with his learning disabilities, he would have complied with the rule. <u>Id.</u> at 848-49.

23

Much of the parties' briefing focuses on the time when John transferred from the parochial school to the boarding school and repeated freshman year. John's disability, it is agreed, did not precipitate these events. Not only was John not diagnosed with any learning disabilities by this time, but the record reflects he was doing well as a freshman in his parochial school, having an average GPA of 89.0 and a PSAT score in the 94th percentile in evidence-based reading and writing, and in the 96th percentile in math. Application at 47, 50, 67. Neither the paperwork from the parochial school nor the application material to the boarding school mentions academic or social difficulties. In fact, the application material emphasizes John's strong academic abilities. See, e.g., id. at 61 (noting John's "intellect was clear from a young age. He is a voracious reader and has [a] strategic math mind"). Moreover, John's father admitted that what drove the parents' decision to transfer John was the lack of sports in the fall due to the pandemic, the lack of "camaraderie and connectedness in the community," the limited communication among John and his friends, and the implementation of remote learning. James Dep. at 28-29; Evaluation Report at 94; see also James Dep. at 99-100 (agreeing with the RIIL Decision finding that it was a "personal choice" to have John transfer to a boarding school and repeat freshman year).

The record also reflects that John did not repeat freshman year because of his learning disabilities. Based on advice John's parents received from the boarding school's administrators, advisors, and friends of theirs who have sent their children to boarding school, John "reclassif[ied] so that [he] [could] have a full four-year experience . . . and . . . [receive the] benefits of having a little more maturity and preparation for what is . . . a pretty rigorous academic environment." James Dep. at 43-44.

If the Court were to consider only the facts related to the initial transfer, John's Motion would fail on the merits because the record does not demonstrate that it was his disability that caused John to transfer and repeat his freshman year.

The analysis changes, however, when looking at the fulcrum of events leading up to John's second transfer, from the boarding school to his current private school. The League's counsel conceded at the hearing that, had the plaintiff not left the boarding school, he would have been eligible to play sports for the remainder of his time there. See Hr'g Tr. at 11-12, 44-45; see also James Dep. at 46 (describing how it was James's understanding that John could have played four years of sports at the boarding school). Said differently, the boarding school would have allowed him to play competitively through his senior year. It was only when John returned to Rhode Island to enroll in the private school that he fell under the jurisdiction of the League

25

and its Eight-Semester Rule.  See Hr'g Tr. at 44.  The Rule goes into effect once John enrolls in ninth grade, irrespective of where he is schooled, if he enrolls in a school governed by the RIIL. See id. at 44-46.

The record demonstrates that John transferred from the boarding school to the private school because of his disability. After enrolling at the boarding school, John experienced a decline in his academic performance and a deterioration of his physical and psychological health.  For example, John became isolated and anti-social, lost about sixty pounds, acted out, and failed to maintain routines for academic success.  James Dep. at 46-49, 51-54; Evaluation Report at 94-95.  This led to a decline in John's grades.  See James Dep. at 51-52.  At the same time, the boarding school did not provide the personalized attention or services to address John's needs.  Id. at 47-48; Attorney Ltr. at 83; Parents Ltr. at 87-88.  This required John to return to Rhode Island and enroll in a school that could adequately address his needs, for example, with an individualized support plan and counseling.  See James Dep. at 55-58; Attorney Ltr. at 82-83; John Doe Ltr. at 85; Parents' Ltr. at 88.

As in Washington and Dennin, he cannot comply with the Rule because of his transfer, which is directly a result of his disability.  But for his learning disability and related conditions, John would not have transferred from the out-of-state

26

boarding school back to the Rhode Island private school to receive appropriate educational programming.  Had John not been suffering from anxiety, depression, and ADHD, among other impairments, he would have completed his time at the boarding school and played sports through his senior year.  Cf. Washington, 181 F.3d at 849 (agreeing with the lower court that, but for the plaintiff's disability, he would have been "fully capable of performing in high school" and would not have had to drop out).  Only when he returned to Rhode Island did he face the possibility of being prohibited from playing competitive sports during his senior year.  Accordingly, the evidence establishes that there is a causal connection between John's disability and his inability to meet the requirements of the Rule.[14]

---

[14] In the RIIL Decision, the League improperly applied its own rules, preventing it from examining the extent to which John's disability caused his exclusion from playing sports during his senior year.  Rather than apply the disability standard, it applied the undue hardship standard, even though John sought a waiver on the basis of his disability.  Compare Ex. B VC, Waiver Hearing Committee Decision (Apr. 27, 2023) 2-3, ECF No. 1-2; DXL, Michael Lunney Dep. (Jan. 18, 2024) ("Lunney Dep.") 53, ECF No. 11-2; and PXC, Def.'s Answers Pl.'s First Set Interrog. 1, ECF No. 10-3 with Lunney Dep. at 63; and DXD, Attorney Ltr. 82-83, ECF No. 11-2.  Under the League's disability rule - which roughly parrots the requirements of the ADA - the student must show that "his/her inability to meet the RIIL rule(s) is the result of a disability." RIIL R&R art. 1, § 16(H).  By applying the undue hardship rule, rather than the disability rule, the Waiver Committee did not properly examine the causal nexus between John's disability and his ineligibility under the Rule.

Even if the League did apply the disability standard, that may not have solved the League's problem because the Rule does not appear to comply with the ADA.  Under the Rule, in addition to

27

3. Whether John Requested a Reasonable Modification

The guiding framework for determining whether a modification is reasonable is outlined in PGA Tour, Inc. v. Martin, requiring courts to employ an "individualized inquiry."  532 U.S. at 688; see Gelabert-Ladenheim v. Am. Airlines, Inc., 252 F.3d 54, 59 (1st Cir. 2001).  Martin examined the PGA Tour's walking rule, which requires golfers, during tournament play, to walk the entire golf course.  Martin, 532 U.S. at 666-67.  The purpose of the rule is to subject players to fatigue during competition.  Id. at 686. The plaintiff in Martin was a professional golfer who had a degenerative circulatory disorder that limited his ability to walk without suffering serious complications.  Id. at 668.  Despite his documented medical issues with walking, the PGA denied his request to waive the walking rule and to utilize a golf cart.  Id. at 669. In response, the plaintiff in Martin brought an action under Title

---

demonstrating that the student's disability caused his exclusion, the student must provide evidence of hardship.  See id.  Facially, this conflicts with the ADA because the statute requires an entity to provide a reasonable accommodation upon a showing of a qualifying disability, not an undue hardship.  See 42 U.S.C. §§ 12182(a), 12132.  By reverting to the "undue hardship" requirement, the Rule appears to impose additional criteria that raises the threshold for obtaining an accommodation, which is prohibited by the ADA.  See 28 C.F.R. § 35.130(b)(8) ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary.").  In short, both the face and application of the waiver rules appear flawed.

III, arguing that the PGA failed to accommodate his physical disability. Id.

The Supreme Court concluded that allowing the use of a golf cart during tournament play was a reasonable accommodation. Id. at 682. To comply with the ADA, an entity's policies, practices, or procedures must be (1) reasonably modified for individuals with disabilities as necessary to afford access, (2) unless doing so would fundamentally alter what is offered. Id.; see also 28 C.F.R. § 36.302(a). In Martin, the Supreme Court found that waiving the walking rule would not fundamentally alter competition because it neither changed an "essential aspect" of the game nor gave the disabled plaintiff an advantage over other players. Id. at 682-83. Thus, waiving the rule would not upset the "fundamental character" or and "essential attribute" of the game.[15] Id. at 684-85. A determination of whether a modification is reasonable is a fact-specific inquiry. Starego, 970 F. Supp. 2d at 309. It is the defendants' burden to demonstrate that a reasonable modification "would alter the fundamental nature" of a program or

---

[15] The reasonable accommodation analysis in PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001), also applies to Title II claims. See, e.g., Cruz v. Pa. Interscholastic Athletic Ass'n, 157 F. Supp. 2d 485, 498-99 (E.D. Pa. 2001); see also 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications . . . unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.").

"pose[] a direct threat to the health or safety of others." Dudley, 333 F.3d at 307-08.

Waiving the Rule is a reasonable accommodation because doing so is necessary to afford John access to competitive sports. See 42 U.S.C. § 12182(b)(2)(A)(ii); Martin, 532 U.S. at 688. But the League argues that waiving the Rule with respect to John "would alter the nature of the program." Def. Mem. 14. It posits that John would take the starting place of other students and cause "[un]fairness" among student athletes. Id. at 15. It principally relies on two cases that found as such. See id. at 13-15 (relying on McPherson v. Mich. High Sch. Athletic Ass'n, 119 F.3d 453, 461-63 (6th Cir. 1997); Pottgen, 40 F.3d at 929-31).

The League has not shown that a waiver would fundamentally alter high school athletics in Rhode Island. The Supreme Court in Martin outlined two modifications that may "constitute a fundamental alteration." 532 U.S. at 682. Either the change modifies an "essential aspect of the game" that affects all competitors – e.g., changing the diameter of a golf hole – or it alters a "peripheral" rule that may "nevertheless give a disabled player . . . an advantage over others." Id. at 682-83. Neither are present here.

First, the Eight-Semester Rule is not an "essential aspect" of competition. Id. at 682. What is essential are the rules for the respective sports to ensure both fairness and safety among

30

students. See, e.g., RIIL R&R art. 15, § 1, https://www.riil.org/page/3045 (last visited May 28, 2024) (mandating that all basketball games play according to the National Federation of State High School Association Basketball Rules); RIIL R&R, art. 19, § 1, https://www.riil.org/page/3049 (last visited May 28, 2024) (outlining the rules of contact for football). Nor does it affect the League's governing values such as "equity, fairness, and justice," "fair play and honorable competition," and "treating people with dignity and respect." RIIL Mission Statement at 1.

To be sure, the Rule is not meaningless as it aims to prevent redshirting,[16] ensure no student or team has an unfair advantage, and maintain competitor safety. Even still, the Rule is "at best peripheral." See Martin, 532 U.S. at 689. This is because the League, when pressed, did not articulate a justification for why the Rule is essential to Rhode Island high school athletics. The League's explanation for why the Rule must be enforced here boils down to the idiom, "rules are rules." See Hr'g Tr. at 31-32, 39. This explanation, however, cannot satisfy the League's burden on its own. Cf. Martin, 532 U.S. at 689 ("[P]etitioner's claim that all the substantive rules . . . are sacrosanct and cannot be

---

[16] Redshirting is the act of gaining a competitive advantage over other students by repeating a year of school to have additional time to grow, develop, and mature. McPherson v. Mich. High Sch. Athletic Ass'n, Inc., 119 F.3d 453, 456 (6th Cir. 1997).

modified under any circumstances is effectively a contention that it is exempt from Title III's reasonable modification requirement."). The League also suggests that the Rule is essential because it promotes harmony among the member schools. See Hr'g Tr. at 31-33. But the League did not explain how waiving the Rule here would upset that harmony.

More significant, however, was the League's concession that a student who, before enrolling in high school, spent two years in athletic training but only used a tutor without obtaining credit, would be allowed to play high school sports in Rhode Island if he were to enroll in ninth grade at fifteen or sixteen. See id. at 44-46. If that student could avoid the application of the Rule, which undermines the League's goal of preventing redshirting and protecting the health and safety of competitors, it is difficult to conclude that waiving the Rule with respect to John would fundamentally alter the nature of athletic programming. This workaround demonstrates that the Rule is not essential.

Second, there is no evidence that the waiver of this "peripheral" rule would give John or his team an unfair advantage over non-disabled students or other teams. See Martin, 532 U.S. at 682-85. The record is clear that John is not redshirting. In fact, John's father testified that John does not plan on playing sports in college. James Dep. at 110. Moreover, John would not be taking another student's place if he were to play, given that

every non-freshman makes the varsity team.  See id. at 83-85; Hr'g

Tr. at 47-48.  And there is no evidence to suggest that he is

guaranteed to have a starting position next year.  See James Dep.

at 83-85.  This fact also leads the Court to conclude that a waiver

for John would not upset fair competition in the state.  See Cruz,

157 F. Supp. 2d at 493, 500 (relying on the school's no-cut policy

to discount the defendant's concern over plaintiff taking another

student's place).  To put it bluntly, John's school does not seem

to have an athletics program that is contending to win a state

championship.  Given the dearth of evidence of John's athletic

abilities and his father's own testimony, it is fair to say that

John is not playing a fifth year of sports to be the next Roland

Steele, see James Dep. at 110, undermining the League's argument

that John's presence would fundamentally alter competition.  See

Cruz, 157 F. Supp. 2d at 493, 499 (noting that the plaintiff

student is not a "'star' player in any of his interscholastic

sports" in concluding that allowing him to play would not

"fundamentally alter" competition).

Taken together, there is no evidence to suggest that waiving

the Rule here would alter an "essential aspect" of competition or

give John or his team an unfair advantage.  See Pottegen, 40 F.3d

at 932-33 (Arnold, J., dissenting) ("But if a rule can be modified

without doing violence to its essential purposes, . . . I do not

33

believe that it can be 'essential' to the nature of the program or activity to refuse to modify the rule.").

\*    \*    \*    \*    \*

In sum, John has demonstrated actual success on the merits. The record demonstrates that Titles II and III of the ADA apply to the League, John's disability caused his exclusion under the Rule, and a waiver of the Rule would be a reasonable accommodation that would not fundamentally alter the nature of high school athletic competition in Rhode Island. The Court will now turn to the other equitable considerations.

**B. Irreparable Harm**

John would be irreparably harmed if barred from playing sports during his senior year. As part of John's diagnosis for depression, anxiety, and ADHD, among his other diagnoses, doctors recommended that John get involved in interscholastic sports. That, along with medication and academic support, improved John's academic, social, physical, and psychological well-being. This assertion is supported by John's psychiatrist, James Dep. at 55-58, and is recognized by the League's very own mission statement.[17]

---

[17] RIIL Mission Statement at 115-16 ("Athletic competition is a major component [of] education. . . . Research indicates that student-athletes have better grades than non-athletes and that student-athletes have higher attendance rates and higher graduation rates than non-participants."); id. at 116 ("Sports and activities provide not only the opportunity to teach and learn respect for self and respect for others, they also place participants in a unique context - competition - that can further

Preventing John from being part of a team – competition and all – risks reversing the progress he has made in addressing his psychological challenges.  See Cruz, 157 F. Supp. 2d at 491-92, 500 (similarly finding that preventing the plaintiff student from participating in competitive sports would cause irreparable harm considering his IEP); Dennin, 913 F. Supp. at 667 (describing how preventing the student from playing interscholastic sports would irreparably harm the student's self-esteem and social skills); cf. Washington, 181 F.3d at 853 (positively considering the academic and social benefits that competitive sports have on the plaintiff's high school experience).

At an intangible level, if John were barred from playing competitively, he would miss out on creating unique memories as a senior in high school.  Simply put, John is only a senior once in his life.  As Coach Dan Devine said in Rudy, "And for you seniors, it's your last one, so make it count because you'll remember it for the rest of your lives."[18]  Such memories are priceless and constitute irreparable harm in their absence.  See Lyon v. Ill. High Sch. Ass'n, No. 13 C 173, 2013 WL 309205, at *5 (N.D. Ill. Jan. 25, 2013) (finding the student's argument that he may miss "a once in lifetime opportunity" by not playing sports persuasive if

_____

instill and hone values necessary for the development of respect for self and respect for others.").

[18] Rudy (Sony Pictures Entertainment 1993).

it had to consider the student's irreparable harm, albeit the student did not establish a likelihood of success on the merits).

The League avers that John would not be irreparably harmed because he could still practice and scrimmage with the team and assist in charitable work. Def. Mem. 19; Hr'g Tr. at 38-39. Anyone who has played high school sports or engaged in other competitive activities know that just practicing with a team is no substitute to being part of a team in competition, especially during one's senior year. Relegating John to just practice would fundamentally alter his athletic experience. It is not difficult to imagine that being excluded from competition would also change the way he and his teammates would practice, seeing as there is no incentive for the team to actively integrate him in practice. And the League's argument does not tackle the very real possibility that preventing John from competing with his team would negatively affect his progress in addressing his disabilities. Accordingly, the Court finds that John would be irreparably harmed absent injunctive relief.

### C. Balance of Equities

In balancing the equities, the Court concludes that the harm imposed on John is greater than that imposed on RIIL. As discussed above, by not competing, John could lose out on athletic programs that have had a substantial benefit on his overall well-being and

his efforts to overcome his learning disabilities, in addition to the memories he would gain by playing.

The League complains of the floodgate of requests that it could receive if the Court were to grant the injunction.  Def. Mem. 20-21.  RIIL's assertion, however, is neither backed by adequate evidence, nor compelling even if true.  Over the past ten years, it has received 64 waiver requests, an average of a little under 7 per year.  Id. at 20.  Of those requests, the League does not identify those like John's situation that would likely be approved if the League complied with the ADA.  And the League does not endeavor to predict how many students would seek a waiver if the Court finds in John's favor.  Given that the exigencies of the COVID-19 pandemic are behind us and the unusual nature of John's predicament, a scenario in which the League will be inundated with waiver requests like John's seems unlikely.  But more importantly, the League's point amounts to saying that accommodating people with disabilities is hard and they should not have to do it.  Treating people with disabilities with sensitivity and compassion may take some effort and require previously unimagined flexibility, it is true.  But that is what living in a civilized society is all about and what the law demands of us.

In summary, the balance of equities weighs in John's favor.  See Washington, 181 F.3d at 853 (finding no abuse of discretion where the lower court valued the benefits of competitive sports to

the plaintiff over the concerns of the sports league, namely the administrative burdens, the fear the plaintiff would take another student's place, and potential unfair advantages).

### D. Public Interest

A permanent injunction would not negatively affect the public interest.  In fact, it would serve the public interest.  Achieving the goal of full inclusion of disabled individuals in economic and social life is in the public's interest.  See Martin, 532 U.S. at 674-75; Dudley, 333 F.3d at 303.  Allowing disabled students to play in competitive sports contributes to that goal.  Steines ex rel. Steines v. Ohio High Sch. Athletic Ass'n, 68 F. Supp. 3d 768, 783 (S.D. Ohio 2014).  Moreover, there is no evidence in the record to suggest that John's involvement in competitive sports would significantly affect the level of competition within the league, pose any harm to other students, or displace other students.  See Washington, 181 F.3d at 853-54.  Thus, the public interest would not be adversely affected in issuing a permanent injunction here.

### IV.  CONCLUSION

Rudy had no business playing on the Notre Dame football team.  As a defensive end, he simply did not have the skills like his compatriots.  Nevertheless, with the support of his cheering teammates and fans packed in Notre Dame Stadium, he got his chance to play.  Why?  Because everyone recognized the importance of Rudy having his one moment, one memory, playing as a senior with the

38

Fighting Irish.  John Doe is like Rudy.  He may not be a future Heisman Trophy recipient, but, even so, he deserves his moment to play competitively with his team as a senior.  Those are the memories that will stick with him.

This Court says, let the kid play.  Accordingly, for the reasons above, Plaintiffs' Motion for a Permanent Injunction, ECF No. 6, is GRANTED.


IT IS SO ORDERED.

_WESmith_

William E. Smith
District Judge
Date: May 28, 2024

# RHODE ISLAND INTERSCHOLASTIC LEAGUE
## DECISION

**IN THE MATTER OF** ███████████████████████

**Waiver Request Heard by: Principals' Committee on Athletics**
The hearing was held on Thursday, August 24, 2023

## BACKGROUND

The nature of the relief sought before the Waiver Hearing Committee (the "Committee) is a waiver of the Rhode Island Interscholastic League's ("RIIL") Eight Consecutive Semester Rule contained in Article 3, Section 5 of the RIIL's Rules and Regulations in order to participate in athletics at ███████████████████████ during the 2024-2025 school year.

Testimony was taken and minutes of the hearing were kept.

The Committee members were:

- ███████████, Principal of Toll Gate
- ███████████, Principal of Cranston East
- ███████████, Principal of Tiverton
- ███████████, Principal of Pilgrim
- ███████████, Assistant Principal of West Warwick
- ███████████ Principal of South Kingstown
- ██████████ Principal of St. Raphael
- ██████████ Assistant Principal of Cranston East
- ██████████, Superintendent of Burrillville SD
- █████████ Director of Athletics at Portsmouth SD

The Committee heard the testimony and arguments from the following individuals:

- ███████████, Applicant
- ███████████████████, Applicant's Parents
- ██████████████████ High School Athletic Director
- ███████████, Attorney

The Committee also was presented with and duly analyzed the following documents, which were accepted as Exhibits:

- Waiver Request Form
- Applicant's Transcripts
- Existing Supporting Documents presented prior to the WHC Hearing:
  - Confidential medical records
  - Letter from ██████████, Family Attorney
  - Letter from ██████████ Applicant
  - Letter from the Parents, ██████████████████
  - Letter from █████████s, Psychiatrist
  - Letter from ██████████, Consultant
  - Letter from ██████████ Director of Wellness at ██████████
  - ██████████ Individual Support Plan
  - College Board information

Add. 040

- o Learning Evaluation Report from Frankenberger Associates
- New Supporting Documents presented prior to the PCOA Hearing
  - o Additional Letter from ██████████, Psychiatrist
  - o Letter from ██████████ Applicant's Doctor
  - o ACT Test Accommodations
- No further exhibits were offered at the hearing.

**FINDINGS**

After consideration of the all the testimony and exhibits presented, the Committee makes the following findings of fact:

*THAT*  the Applicant was provided ample notice of the hearing.

*THAT*  the burden of proof of the hardship is imposed on applicant pursuant to RIIL's Rules and Regulations.

*THAT*  ▓▓▓▓▓▓▓▓ is the Principal at ▓▓▓▓▓▓ and is a voluntary member of the Rhode Island Interscholastic League.

*THAT*  the Administration from ▓▓▓▓▓▓▓ is fully aware of and understands the language and intent of the Eight Consecutive Semester Rule contained within the RIIL's Rules and Regulations and its universal application to all student-athletes.

*THAT*  the Principal did not appear at the hearing but supported the request.

*THAT*  the Applicant was a freshman in 2020-21 at ▓▓▓▓▓▓▓ and participated in basketball, football, and outdoor track & field.

*THAT*  the Applicant passed all academic courses during his freshman year at ▓▓▓▓

*THAT*  the Applicant believed he was not reaching his full potential as a student enrolled at ▓▓▓ during his freshman year in 2020-21.

*THAT*  the Applicant made the choice to transfer to ▓▓▓▓▓▓ in New Hampshire for his second year in 2021-22, reclassified as a freshman, and participated in football, basketball, and lacrosse.

*THAT*  the Applicant and his family stated that ▓▓▓ struggled mentally and physically during his second freshman year of high school at ▓▓▓ due to the lack of social interaction at the boarding school, issues focusing on schoolwork, and lack of appropriate academic supports.

*THAT*  the Applicant passed all of his academic courses during his second year of high school at ▓▓▓▓

*THAT*  the Applicant and his family made the choice to leave ▓▓▓ at the end of the academic year when ▓▓▓ returned from the boarding school.

*THAT*  the Applicant was diagnosed with certain learning disabilities in the summer of 2022.

*THAT*  the Applicant made the choice to transfer to ▓▓▓▓▓ for his reclassified sophomore year (third year in high school) in 2022-23 and participated in football and basketball.

*THAT*  the Applicant has a documented "Individual Support Plan" in place at ▓▓▓▓▓ since September of 2022.

*THAT*  the Applicant passed all courses during his third year of high school at ▓▓▓▓▓.

***THAT*** the Applicant is currently enrolled in his fourth year of high school at █████████ in 2023-24, is participating in Football during the fall 2023 season and eligible to participate in the remaining winter and spring seasons.

***THAT*** the Applicant's stated hardship is the documented learning disabilities formally diagnosed in the summer of 2022 and aforementioned issues at █████████.

***THAT*** the Applicant has been eligible to participate in interscholastic athletics during his entire high school career to date and intends to continue participating in athletics throughout the 2023-24 school year, his 8th consecutive semester since first enrolling in high school.

***THAT*** the Applicant's stated hardship has not impacted his ability to participate in athletics or progress academically at any time during his high school career.

***THAT*** the documentation and testimony presented did not establish an academic or athletic hardship to support a waiver from the uniform application of the rule as stated in Article 1, Section 16 of the Rules and Regulations of the RIIL.

**CONCLUSION**

After due consideration of the testimony and exhibits presented, the Committee has concluded by a vote of 0-10-0 that the Applicant failed to identify sufficient extenuating circumstances to establish an undue hardship. Considering the purposes and fundamental philosophy of the RIIL as set forth in Article 1, Section 2 of the Rules and Regulations, a disproportionate impact will not result to the Applicant and the committee must ensure an even-handed and appropriate perspective in the treatment of this and other such applicants.

**IT IS THE DECISION OF THE PRINCIPALS' COMMITTEE ON ATHLETICS THAT THE REQUEST BE DENIED.**

**RHODE ISLAND**
**INTERSCHOLASTIC LEAGUE**

Dated: September 12, 2023          By: _____

Thomas H. Marcello
Assistant Executive Director

## RHODE ISLAND INTERSCHOLASTIC LEAGUE
## <u>DECISION</u>

**IN THE MATTER OF** █████████████████████

**Waiver Request Heard by: Waiver Hearing Committee**
The hearing was held on Thursday, April 27, 2023

### <u>BACKGROUND</u>

The nature of the relief sought before the Waiver Hearing Committee (the "Committee) is a waiver of the Rhode Island Interscholastic League's ("RIIL") Eight Consecutive Semester Rule contained in Article 3, Section 5 of the RIIL's Rules and Regulations in order to participate in athletics at ███████████████ ("████████") during the 2024-2025 school year.

Testimony was taken and minutes of the hearing were kept.

The Committee members were:
- Candace Calouri, Principal of Toll Gate
- Jared Vance, Principal of Rogers
- Brooke Macomber, Principal of Coventry
- Barbara Morse, Principal of North Kingstown
- Mary Watkins, Principal of Davies
- Mike Lazzareschi, Principal of Burrillville

The Committee heard the testimony and arguments from the following individuals:
- ███████, Applicant
- ███████, Applicant's Mother
- ███████, Applicant's Father
- ███████ High School Athletic Director
- ███████, Family's Attorney

The Committee also was presented with and duly analyzed the following documents, which were accepted as Exhibits:
- Waiver Request Form
- Applicant's Transcripts
- Supporting Documents:
  - Confidential medical records
  - Letter from ███████ Family Attorney
  - Letter from ███████, Applicant
  - Letter from the Parents, █
  - Letter from ███████, Psychiatrist
  - Letter from ███████, Consultant
  - Letter from ███████, Director of Wellness at ███████
  - ███████ Individual Support Plan
  - College Board Information
  - Learning Evaluation Report from ███████
- No further exhibits were offered at the hearing.

**FINDINGS**

After consideration of the all the testimony and exhibits presented, the Committee makes the following findings of fact:

> ***THAT***   the Applicant was provided ample notice of the hearing.

> ***THAT***   the burden of proof of the hardship is imposed on applicant pursuant to RIIL's Rules and Regulations.

> ***THAT***   ███████████ is the Principal at ██████████ and is a voluntary member of the Rhode Island Interscholastic League.

> ***THAT***   the Administration from ██████████ is fully aware of the understands the language and intent of the Eight Consecutive Semester Rule contained within the RIIL's Rules and Regulations and its universal application to all student-athletes.

> ***THAT***   the Administration did not appear at the hearing but supported the request.

> ***THAT***   the Applicant was a freshman in 2020-21 at ██████████ and participated in basketball, football, and outdoor track & field.

> ***THAT***   the Applicant made the personal choice to transfer to ███████████████ for his second year in 2021-22, reclassified as a freshman, and participated in football, basketball, and lacrosse.

> ***THAT***   the Applicant made the personal choice to transfer to ██████████ for his reclassified sophomore year (third year in high school) in 2022-23 and participated in football and basketball.

> ***THAT***   the Applicant believed he was not reaching his full potential as a student enrolled at ██████ during his freshman year in 2020-21.

> ***THAT***   the Applicant stated he struggled with many aspects of boarding at █████ as well as the lack of academic support provided by the school.

> ***THAT***   the Applicant was diagnosed with certain learning disabilities in the summer of 2022.

> ***THAT***   the Applicant has a documented "Individual Support Plan" in place at ██████████ since September of 2022.

> ***THAT***   the Applicant has participated in interscholastic athletics during all six of his semesters so far in his high school career.

> ***THAT***   the Applicant intends to remain enrolled at ██████████ for his fourth year of high school in 2023-24 and is eligible to participate in athletics under the Eight Semester Rule.

> ***THAT***   the Applicant intends to remain enrolled at ██████████ for his fifth year of high school in 2024-25.

*THAT* the Applicant's contended hardship is the documented learning disabilities ████ has endured since 9th grade at ████ and formally diagnosed in the summer of 2022.

*THAT* the Applicant's learning disabilities did not impact his ability to participate in athletics during his first six semesters of high school.

*THAT* the documentation and testimony presented did not establish an academic or athletic hardship to support a waiver from the uniform application of the rule as stated in Article 1, Section 16 of the Rules and Regulations of the RIIL.

**CONCLUSION**

After due consideration of the testimony and exhibits presented, the Committee has concluded by a vote of 0-6-0 that the Applicant failed to identify sufficient extenuating circumstances to establish an undue hardship. Considering the purposes and fundamental philosophy of the RIIL as set forth in Article 1, Section 2 of the Rules and Regulations, a disproportionate impact will not result to the Applicant and the committee must ensure an even-handed and appropriate perspective in the treatment of this and other such applicants.

**IT IS THE DECISION OF THE WAIVER HEARING COMMITTEE THAT THE REQUEST BE DENIED.**

                                        **RHODE ISLAND**
                                        **INTERSCHOLASTIC LEAGUE**

Dated: April 28, 2023                   By: _____
                                        **Thomas H. Marcello**
                                        **Assistant Executive Director**



# Article 1: THE ORGANIZATION

<u>Section 1: NAME</u>

A. For the purpose of competition, the schools under the jurisdiction of the Principals' Committee on Athletics shall be known as the RHODE ISLAND INTERSCHOLASTIC LEAGUE; a voluntary association of Principals who pledge their schools and participants to follow the Rules and Regulations of the Rhode Island Interscholastic League as enacted by the Principals' Committee on Athletics.

<u>Section 2: PURPOSE AND FUNDAMENTAL PHILOSOPHY</u>

A. The **RHODE ISLAND INTERSCHOLASTIC LEAGUE** d/b/a the Principals' Committee on Athletics will within its jurisdiction supervise and control the athletic programs, contests, and schedules and matters relating thereto, in participating secondary schools (grades 9-12) of the State of Rhode Island, whose principals are members of the Rhode Island Association of School Principals, to maintain, improve and raise the athletic standards in the participating schools of the State of Rhode Island, and in general carry on any other lawful activity which is calculated, directly or indirectly to promote and enhance the goals of the Rhode Island Interscholastic League.

B. The **RHODE ISLAND INTERSCHOLASTIC LEAGUE** is a voluntary, incorporated, non-profit association of Principals organized to coordinate the efforts of its members toward the ultimate objectives of interscholastic activities. The purposes of this Association are to:

1) emphasize varied seasonal activities with broad participation under the direction and supervision of the school;
2) maintain interscholastic activities in proper perspective and not to overemphasize them to the detriment of the academic program of the schools;
3) formulate minimum uniform and equitable standards of eligibility that must be met by students to attain the privilege of representing their schools in interscholastic activities;
4) provide a fundamentally fair and equitable framework in which interscholastic athletic competition in an educational setting can take place;
5) promote an interscholastic athletics program providing educational experiences not otherwise provided in the curriculum, which will develop areas of knowledge, skills and emotional patterns and will contribute to the development of well-rounded individuals and better citizens;
6) create and maintain a harmonious relationship between all schools within the **RIIL**, public, private and parochial;
7) foster a cooperative spirit, good sportsmanship, and school spirit on the part of school representatives, school patrons, and students;
8) prevent professionalism and undue pressure on students from parents, coaches and peers;
9) promote even competition and maximum participation in **RIIL** activities by minimizing the impact of individual wealth upon equal athletic opportunity; and

10) be sure that non-school activities do not interfere with the academic and interscholastic programs, are sponsored primarily for the benefit of the participants and do not result in exploitation of high school youth.

Section 3: DEFINITION OF TERMS

    A. Board - the Rhode Island Board of Officials for the respective sports

    B. Chair - unless otherwise defined, shall refer to the Chairperson of the Principals' Committee on Athletics.

    C. Committee - unless otherwise defined, shall refer to the Principals' Committee on Athletics.

    D. Director(s) - unless otherwise defined, shall refer to the director of the particular sport(s) in question.

    E. Executive Committee - unless otherwise defined, shall refer to the Chair, the Executive Director, and the President of the Rhode Island Association of School Principals or his/her designee.

    F. Executive Director - the Executive Director of the Rhode Island Interscholastic League

    G. Assistant Director - the Assistant Director of the Rhode Island Interscholastic League

    H. Field - unless otherwise defined, shall refer to the area upon which a game is played.

    I. Game - to be regarded as interchangeable with the terms meet, match, or contest. The sports involved are Baseball, Basketball, Cheerleading, Cross Country, Field Hockey, Football, Golf, Gymnastics, Hockey, Lacrosse, Soccer, Softball, Swimming, Tennis, Winter and Spring Track, Volleyball and Wrestling. (See Article 7, Section 2.)

    J. IEP - Individual Educational Plan

    K. Non-League Games - any game which falls within the maximum number of games outlined in Article 7 and which is not part of the adopted RIIL schedule, playoffs or Round Robin games.

    L. Principal - the chief operating officer of the member school who is eligible for membership

    M. RIASP - the Rhode Island Association of School Principals

    N. RIIL - the Rhode Island Interscholastic League d/b/a the Committee

    O. Round Robin - a sanctioned athletic contest played for the Rhode Island Interscholastic Injury Fund - also known as the Injury Fund Game.

    P. Rules - the Rules and Regulations of the Rhode Island Interscholastic League or other rules as referred to herein.

    Q. School - unless otherwise defined, shall refer to a member school whose grade levels are certified by the Rhode Island Department of Education. Competition on behalf of the school shall be limited to students enrolled in Grades 9-12 in those schools certified as four-year high schools and Grades 10-12 in certified three-year high schools. All grade levels in the school shall be under the academic control and supervision of the Principal.

    R. Scrimmage - shall be defined as a controlled practice supervised by coaches which does not meet any of the requirements for a game. (See Article 7, Section 2.)

    S. Semester(s) - said period(s) shall be computed without reference to the athlete's physical presence in the school, all semesters being consecutive school calendar semesters and not individual athlete attendance semesters.

\*     \*     \*

\*       \*       \*

<u>Section 16. WAIVER OF RULES FOR STUDENT ELIGIBILITY</u>

A. All requests for waivers shall (a) be submitted to the Executive Director, and (b) be in writing. For waivers of student eligibility, the waiver must be submitted on a "Waiver Request Form" supplied by the RIIL, signed by the Principal of the school requesting the waiver and notarized.

B. In seeking a waiver of rules for student eligibility, please include (in addition to the Waiver Request Form) the student-athlete's:

   (1) official transcript

   (2) supporting letters

   (3) medical documentation (if applicable)

   (4) IEP (if applicable)

   (5) any documentation/evidence to substantiate a hardship or extenuating circumstance exists

C. The RIIL Executive Director (or designee) shall upon the basis of the completion of the waiver request and documentation provided determines whether the waiver shall be granted or not granted.

   (1) Whenever a request of a wavier is acted upon by the Executive Director (or designee), a copy of the decision will be forwarded to the Principal of the sending school.

   (2) A negative decision may be appealed before the Waiver Request Hearing Committee.

D. Waiver Request Hearing Committee

   (1) Waiver requests are addressed by the Waiver Request Hearing Committee. This committee consists of four members (high school administrators) selected by the Principals' committee on Athletics and the Chairperson of the Principals' Committee on Athletics. A majority vote of the members present is required for a decision. Hearings are held in August, October, and February, or at special meetings called in order to accommodate all waiver requests.

E. Appeals of decisions made by the Waiver Request Hearing Committee will be heard by the Principals' Committee on Athletics. Principals Committee on Athletics meetings are scheduled for August, September (if needed), November, January, March and June. In extenuating circumstances, which would cause undue hardship, these Rules may be waived by 60% of the members of the Principal's Committee on Athletics present and voting. See Article 8, Section 4, paragraph B.

F. Waivers are exceptional and extraordinary relief from the Rules and Regulations of the RIIL. The applicant must convince sixty percent (60%) of the Committee present and voting of the extenuating circumstances constituting undue hardship. Undue hardship means a hardship peculiar to the student-athlete or individual caused by unforeseen events beyond the election, control or creation of the student-athlete or individual, his/her family, or school. The Committee interprets undue hardship particular to the situation of the individual which is so severe that normal application of the Rule(s) is not, in the opinion of the sixty percent (60%) of the members voting, necessary to carry out the spirit or the orderly enforcement of the Rule.

G. All requests for a waiver of Rules, with all documentation complete, must be received in the RIIL office by noon on the first Friday of the month in which a hearing is sought. A waiver request that is submitted to the RIIL in accordance with this paragraph shall be placed on the agenda for the next meeting of the Waiver Request Hearing Committee or the next full Committee meeting and shall be heard at that meeting. If the waiver request is resolved to the requesting party's satisfaction prior to the full Committee meeting by the Waiver Request Hearing Committee; (Which shall be designated by the Chair pursuant to paragraph 'E' of this section.) it shall not be heard at the full Committee meeting. In emergencies, the Chair can add a waiver request to the agenda, notwithstanding the above requirement.

H. In cases where a waiver of any rule is sought on the basis of disability, a waiver may be granted, as set forth above; if the student-athlete is able to show that his/her inability to meet the RIIL rule(s) is the result of a disability, and that s/he otherwise meets all of the essential requirements of participation in RIIL competition with or without a reasonable modification. The party making a waiver request shall state on the request form that a disability is claimed and specifically identify the disability and hardship. The party making the request shall also provide the Committee with all appropriate evidence documenting his/her disability and hardship, including medical evidence and any applicable IEP.

I. Limitations:

(1) No retroactive waiver may be granted.

(2) No waivers will be considered of the requirement that the student-athlete must not have completed a course of study at a high school or the equivalent.

(3) Financial waivers may be considered if the financial hardship involves bankruptcy, receivership, death of a parent, or other extenuating circumstances.

(4) Age waivers will be considered only if extraordinary circumstances are supported by a valid, in place and complied with IEP addressing the disability, which resulted in the grade placement. No waivers will be granted to permit a student-athlete to exceed the maximum number of seasons set forth in Article 3. The student-athlete must at all times be in compliance with the IEP and the RIIL's academic rules. If the IEP ceases or compliance ceases, then the waiver ceases.

(5) Waivers of Article 3, Section 4C, may be granted only when the repeating of the school year is caused by an illness that is medically documented and results in significant loss of school time. In no case shall a waiver be granted if the waiver results in the student-athlete having more than four (4) seasons of competition in a given sport or three (3) seasons of competition in a three-year high school.

J. H. The Chair or the Executive Director shall review all waiver requests as filed and shall dismiss any request found to be procedurally or substantively without merit or on its face ineligible for consideration by the Committee. No such request shall be placed on the agenda unless a written demand by two Committee members is presented.

K. Hearings before the Waiver Request Hearing Committee or the full Committee are conducted in an informal manner that affords all parties an opportunity to present all information and all relevant arguments. A party requesting a waiver may be represented before the Committee or Waiver Request Hearing Committee by an attorney or other designated representative at their expense. Unduly repetitious evidence may be excluded. All evidence offered by a party will be included in the file of the proceedings. The evidence will be available for inspection by the party requesting a waiver or his/her designee.

L. A party requesting a waiver in advance of the hearing may request that the hearing be transcribed at their cost and expense. If the request is granted, the Committee shall be provided a copy of such transcript at no cost to the Committee.

<center>*     *     *</center>



# Article 3: ELIGIBILITY

<u>Section 1. DETERMINATION OF ELIGIBILITY</u>

A. All questions of eligibility are to be submitted in writing to the Executive Director seventy-two (72) hours prior to a regularly scheduled meeting for consideration by the Committee. Schools will be notified of the decisions by letter.

B. **Each school must file Eligibility Lists online with the RIIL Office for varsity athletes within 10 days of the start date of the sport season.** The grade and year in school since grade 9 (if different from grade) of each participant should be noted on the eligibility list. **Any school(s) failing to file the Eligibility Lists on or before the designated date will be assessed two hundred dollars ($200.00) fine per missing eligibility list as defined in Article 6, Section 4.**

   1) Athletes listed on the eligibility list may play on an outside team under the terms and conditions as outlined in Article 7, Section 6.

   2) A student not on a varsity list who participates in a Varsity contest will not be penalized if the error of omission was caused by a school official/coach. However, penalties listed in Article 6, Section 6 will be imposed.

   3) Once the original list is filed, it is the school's responsibility to send in additional names of eligible students upon a similar form.

      a. NOTE: Failure to submit an Eligibility List and/or the omission of a player's name will be subject to penalties as listed in Article 6.

C. Any athlete who does not have on file in the RIIL Office a valid Assumption of Risk form will be ineligible for competition in the RIIL. If a student transfers from one school to another, s/he must file a new Assumption of Risk form with the RIIL office. Penalty is a one hundred dollar ($100.00) fine.

   1) Athletes in any sport, requiring helmets, must be equipped with a warning label regarding the risk of use and injury.

D. Upon approval from the school, the RIIL permits athletes to participate simultaneously in more than one sport during the same sport season. However, no athlete may participate in the same sport for more than one athletic season in any given academic school year.

E. When members of a team are charged with being ineligible by an opposing team, the game shall be played as scheduled and the protest filed with the RIIL Office in accord with the provisions of Article 5.

F. Student-athletes must be enrolled in the school for which they participate.

   1) Student Athletes enrolled at an RIIL Member School are prohibited from participating in any practice, tryout, or competition for any school that they are not enrolled in.

   2) Exceptions:

a. Students who attend a state certified career and technical facility and/or a state certified career pathways program**,** except for Davies Career and Technical High School are eligible for athletic participation under the following guidelines.

   i. If a student-athlete declares that s/he wants to participate in athletics at his/her feeder school, s/he cannot participate at his/her career and technical and/or career pathways program school in all sports for the school year.

   ii. Note: Feeder School is defined as the public high school in the community in which the student resides.

   iii. If a student-athlete declares that s/he wants to participate in athletics at his/her career and technical and/or career pathways program school, s/he cannot participate at his/her feeder school in all sports for the school year.

   iv. Note: To be eligible immediately under this exception, the student must transfer to the career and technical and/or career pathways school at their first opportunity to do so. If the student does not transfer to the career and technical and/or career pathways school at their first opportunity, s/he shall be subject to the Transfer as set forth in Article 3, Section 6, of the Rhode Island Interscholastic League Rules and Regulations.

b. Once a student establishes athletic eligibility at either his/her feeder school or career and technical and/or career pathways program school and subsequently decides that s/he would prefer to participate for the other school, s/he shall be subject to the Transfer Rule as set forth in Article 3, Section 6 of the RIIL Rules and Regulations.

   i. The following are guidelines to ensure the home school Principal will have jurisdiction of their student-athletes:

   ii. Students will adhere to all Rules and Regulations of the RIIL and any other more demanding requirements of their feeder school and/or career-technical or career pathways school.

   iii. The Principals of the feeder school, career and technical and/or career pathways program schools will work collaboratively to insure all eligibility requirements are met and that any discipline concerns/problems and school rules are enforced appropriately.

   iv. Students must meet the minimum academic requirements of the career and technical and/or career pathways program school and the feeder school.

G. Students must receive the appropriate number of credits needed to graduate from their feeder school.

H. Any representation of a school by an athlete, whether legal or illegal, must be counted as participation and be so reported on the returns to the RIIL Office.

I. No student below the 9th grade shall be eligible.

J. Academic eligibility rules are minimum requirements and member schools and their governing bodies may adopt higher and more demanding eligibility requirements for local use.

K. Athletes in your district should have a pre-participation athletic physical within your school district stated guidelines.

L. Home School Eligibility - For students in home schooling to be eligible for competition in the RIIL, the following requirements must be met:

1) The student must be listed on the rolls of the school and certified to the Rhode Island Department of Education as a student.

2) The home school must furnish to the school and certify the academic grades and the school must record them on the official school records on a quarterly basis.

3) If a student is ineligible for academic and/or disciplinary reasons and subsequently becomes home schooled; s/he may not participate in interscholastic athletics during the period of ineligibility.

4) The school must approve the request of the home school student to compete on its teams.

5) All other requirements of the Rules and Regulations must be followed with the regular school certifying the eligibility of the home school student

*     *     *

\*      \*      \*

<u>**Section 4.**</u> **ACADEMIC ELIGIBILITY**

    A.  The athlete must be taking at least four subjects, each involving at least four periods of work or an aggregate of fifteen periods of work per week.

    B.  At all times the athlete should have secured for the period from the beginning of the quarter or trimester up to the end of the regular marking period which shall not exceed a maximum of 12 weeks and a passing grade <span style="color:red">in</span> 60% <span style="color:red">of</span> the student's program (credits). <span style="color:red">A student who is not passing 60% of his/her program (credits) is ineligible to participate in games (league and non-league) until the end of the quarter or trimesters of the next marking period.</span> This is a minimum standard for academic eligibility. Schools may choose to

initiate a higher standard for academic eligibility. In this instance, the higher standard (school policy) will be supported by the RIIL.

    1) At the end of a course which meets for multiple marking periods, a school may utilize the grade earned during the last marking period or the final mark earned in determining academic eligibility. However, the school must be consistent in its application of this provision for all athletes in all sports.

C. To be eligible at the beginning of a school year, the student must have done passing work at the end of the previous school year in June of 60% of the student's program **(credits).**

    1) In the case of a student who devotes a considerable part of the summer to make up subjects failed during the school year and receives credit toward graduation for this make-up work, that student shall be entitled to count such credit toward eligibility provided this credit is made an official part of his school record during the first week of the fall term. In case a student fails to complete the minimum scholastic requirements for athletic eligibility at the end of a quarter due to unavoidable absence, the student shall be ineligible for the next quarter until these requirements of the preceding quarter are made-up.

    2) Failures or incomplete work caused by unavoidable absence may be made up at the beginning of the quarter provided it is made a matter of final record within three weeks of the first day of that quarter.

D. The athlete shall receive no special privilege such as extra examinations, delayed marks, make-up opportunities, or other favors which are not granted on equal terms to every student in the school; with the further provision that grades for failures or incomplete work in which a make-up opportunity is granted at the end of a quarterly marking period must be made a matter of final record within two calendar weeks of the first day of the succeeding marking period.

E. If the athlete repeats work for which credit has once been received, the athlete cannot count that subject a second time for eligibility.

F. The athlete cannot count for eligibility points obtained in a subject taken during the summer vacation that had not previously been regularly pursued in the classroom.

G. Admission to or exclusion from participation in a sport because of these eligibility rules, shall take place at the close of the school day on which report cards are issued for the end of the regular marking period.

H. If a game is postponed or results in a tie; the eligibility of the participants does not hold over until the game is played off.

I. Academic eligibility requirement for students who are enrolled in Accelerated Programs:

    1) An accelerated program is one in which a student earns more than the minimum credits necessary for promotion to the senior year. This may be achieved by independent study, taking more than the required number of courses in a given semester or year, taking additional courses at an approved college, or a concurrent enrollment program at an approved college.

    2) Conditions for academic eligibility of seniors in an Accelerated Program:

        a. The student must be enrolled in a minimum equivalent of three full courses per semester in his/her school or an approved off-campus program for a total of three credits for the year, excluding physical education.

        b. If off campus courses are involved, the high school must approve the courses and the grades must be recorded at the high school on the student's permanent record card and are included in the computation for the student's graduation credits.

<u>Section 5. LENGTH OF ELIGIBILITY</u>

A.  Age - An athlete will be ineligible for athletic competition if his 19th birthday occurs prior to September 1st.

    1)  It is recommended that Principals exercise great care in determining the age of contestants and in all doubtful cases secure birth certificates from the city or town clerk of the athlete's place of birth.

    2)  In case of doubt about the age of any contestant in an athletic contest, a birth certificate or some other legal evidence satisfactory to the Committee must be presented to the Chair or Executive Director on demand. If no satisfactory evidence can be presented, the athlete must be barred from competition.

    3)  Competitors in interscholastic sports, who are born outside the state, shall file with their Principal the following: birth certificates or other legal evidence of birth dates (i.e. alien registration cards) and their complete school records in secondary schools attended outside of the state. This data must be made available to the Committee upon request.

B.  Ninth-grade students of four-year high schools are eligible for varsity and junior varsity athletic competition.

    1)  An athlete shall not represent secondary schools in any one sport for more than three seasons and such an athlete shall automatically become ineligible after s/he has been six consecutive semesters in attendance in the 10th, 11th or 12th grade. However, athletes entering the ninth grade may compete for one additional season and two additional semesters provided that competition is in the ninth grade of a four-year high school.

    2)  Once a student enters the 9th grade, whether in a junior high school or a four-year high school, that student is limited to eight (8) consecutive semesters of eligibility and automatically becomes ineligible for athletic competition four years from the date of entry into the ninth grade. (See Article 1, Section 3, paragraph Q.)

    3)  Six weeks shall be considered sufficient to establish a pupil's residence for a semester, which is one-half the established academic school year for that respective school.

    4)  An athlete who has competed according to the rules of the RIIL in the 9th grade of a four-year high school may compete for three additional years in any school too which s/he transfers, subject to the other provisions of these Rules and Regulations.

    5)  If a student who is enrolled in grades nine (9) through twelve (12) and is eligible for athletics but chooses <u>not</u> to participate in athletics for one of more semesters, or does not participate because no sports are offered, or a particular sport is not available, those semesters count as semesters of enrollment and competition.

    6)  If a student who is enrolled in grades nine (9) through (12) is ruled ineligible for any reason for one or more semesters, those semesters count as semesters of competition.

    7)  If a student is suspended or expelled from school for one or more semesters, those semesters count as semesters of enrollment and competition.

C.  Unless a student is entering the 10th grade of a three-year senior high school for the first time, or unless the student enters the 10th grade from a school terminating with the 9th grade, the athlete shall be subject to the 50% Transfer Rule. See Section 5 (an exception would be a transfer by change of address). This period may be lengthened and extended in individual cases at the discretion of the Committee.

D.  Students entering or returning to a secondary school from any court ordered out-of-home disciplinary placement must have their eligibility considered by the Committee on an individual basis. In addition, the receiving school must provide the Committee evidence that the student meets all eligibility requirements as defined in the Rules and Regulations of the Rhode Island Interscholastic League.

E. An athlete who VOLUNTARILY withdraws from school to enter the armed services shall be subject to all rules governing eligibility as listed in Article 3, Section 5 upon his/her return to the same school from which the athlete withdrew. However, if an athlete is DRAFTED into active service by any branch of the armed services, said athlete shall suffer no loss of eligibility providing all other eligibility requirements are met.

F. No student below Grade 9 will be allowed to practice or play with any school freshman, junior varsity or varsity team.

## Section 6. TRANSFER RULE

A. The Transfer Rule:

1) In all transfers, a Transfer Rule Affidavit or Online Transfer Management System entry must be completed and submitted to the Rhode Island Interscholastic League prior to the student-athlete's participation in any sport.

2) If a student transfers from one secondary school to another without a corresponding and bonafide change of address, the student shall be ineligible for the first **35 days** in each sport that s/he participated in during the past 12 months.

   a. The ineligible period of the Transfer Rule begins on the official start date of practice as determined seasonally by the RIIL.

   b. Athletic Programs are prohibited from rescheduling games beyond the 35 day mark in an effort to circumvent the impact of the Transfer Rule.

3) During the period of ineligibility, students subject to the transfer rule may participate in all intra-school activities (practices, team activities, etc.) during the period of ineligibility.

4) During the period of ineligibility, students subject to the transfer rule *may not* participate in any inter-school contests (scrimmages, league games, non-league games, sub-varsity games, playoffs, and/or tournaments) during the period of ineligibility.

5) For all transfers between member schools, the date of enrollment at the receiving school shall be used unless otherwise specified.

6) The provisions of the Transfer Rule apply to all student-athletes participating at the sending school regardless of their level of participation.

   a. Transition Note for Fall of 2023 only: Student-athletes who transfer before the corresponding dates below without a change of address and only participated in sub-varsity competition at their sending school will **not** be subject to the Transfer Rule.

      i. Football student-athletes: Monday, August 14, 2023

      ii. Fall student-athletes: Monday, August 21, 2023

      iii. Winter and Spring student-athletes: Monday, September 4, 2023

7) If the student transfers into a new school with less than 35 days of the sport season remaining, the number of days for which s/he is ineligible will carry over to the next school year in the same sport until the 35 day requirement has been satisfied.

8) If a student actively participating in a sport at their sending school transfers without a bonafide change of address after the official start date of practice, they are subject to the 35 day period of ineligibility from the first day of enrollment at their receiving school and ineligible for postseason play in the specific sport already underway.

9) Note: The RI Interscholastic League will NOT waive the Transfer Rule of athletic eligibility if the change in schools is to nullify and/or circumvent the actions of representatives or rules of the previous school or if the student left the sending school under penalty which would have resulted in the students' athletic ineligibility at the sending school.

B.  A student shall be declared immediately eligible provided:

1) The student's first transfer occurs during their first two semesters (freshman year) or ensuing summer before the dates below:

    a.  Fall student-athletes: Official start date of their sport as defined by the RIIL

    b.  Winter and Spring student-athletes: The first official school day at their receiving school.

    c.  Clarification: freshman students, who are participating in a sport at their sending school and transfer during the season are subject to the Transfer Rule as described in Article 3, Section 6-A.8.

2) There is a corresponding move into a new district by his/her parent(s) or guardian(s) and all other eligibility requirements are met.  The receiving school must confirm the bonafide move and residency.

    a.  Clarification: Student-athletes who attend a parochial or private school and who move into a new public school district may also transfer to another parochial or private school or into the public school in the district of the new residence ***at the time of the corresponding move*** and be immediately eligible to participate in athletics. If the student-athlete remains enrolled in the (previous) parochial or private school after a change of residence and later decides to transfer to another parochial or private school or to the public school in the district of his/her new residence, s/he will be subject to the Transfer Rule.

3) The transfer is the direct or necessary result of a family court custody decree.

4) The transfer is a direct and necessary result of a residence by a guardian whose position is elsewhere herein recognized and the RIIL has so confirmed in writing.

5) The transfer is a direct result of emancipation and said emancipation was recognized and approved by the Committee, pursuant to the waiver provisions of Article 1, Section 16, and both principals agree; in which case the student shall be eligible at once, provided the student's record conforms with the other eligibility requirements of the RIIL. The Committee at its discretion may extend Transfer Rule and the decision in such cases shall be final. If more than one transfer occurs (in the absence of a Family Court custody order) and results in a student establishing occupancy at a former residence, such student shall be ineligible until s/he has been living continuously for one year at said residence.

6) A student transferring because of an order from the office of the School Superintendent effecting administrative adjustment of school population shall become immediately eligible to play in the receiving school, if the student is eligible in all other particulars.

C.  If a student transfers to another school without a bonafide change of residence, s/he may return to their original school and may immediately become eligible provided:

1) The student returns prior to the 15th day of said date of transfer.

    a.  Fall student-athletes begin their 15 days on the first day of official practice as defined by the RIIL.

    b.  All other student-athletes begin their 15 days on the date of enrollment at the receiving school.

2) The Transfer Rule Affidavit has been completed and submitted to the RIIL.

D. Residency Rule and Bonafide Residency Policy:

1) Unless there is a Family Court decision awarding custody to another, the residence of the mother (or legally recognized parent/guardian with custody) shall be judged to be the residence of the student. The student, however, must actually reside at the mother's home. Students who are wards of the state shall become immediately eligible upon being assigned by the proper state authorities to a foster home or equivalent facility. If the student neither resides at the mother's home nor in the home of the person awarded custody by the Family Court, the student shall be subject to all provisions of the Transfer Rule before becoming eligible for RIIL inter-school competition.

   a. Clarification: Any student who legally enrolls at a RIIL member high school residing with someone other than their mother, legally recognized parent with custody, court appointed individual, or legal guardian is declared immediately ineligible until a specific waiver has been obtained pursuant to Article 1, Section 16.

2) In cases where the Family Court decision awards custody to both parents, the student is permitted to change residence between parents and not be subject to the provisions of the Transfer Rule. However, the student will only be eligible to play sports at that school for the academic year. If the student moves back with the other parent and transfers schools, s/he will be subject to the RIIL Transfer Rule and is ineligible for inter-squad competition for the first 35 days of the season.

   a. Clarification: In the absence of a court order or joint custody, students residing outside of the mother's home (or legally recognized parent with custody) are declared immediately ineligible until a specific waiver has been obtained pursuant to Article 1, Section 16.

3) If a student is 18 years of age and transfers from one secondary school to another **with** a corresponding change of address, and both parents are deceased, or are physically absent from the state of RI, or when both parents have been decreed incompetent or unfit by court order, or when a specific waiver has been obtained pursuant to Article I, Section 16, the use of such student-athlete before such written confirmation of eligibility by the RIIL shall constitute the use of an ineligible player under the Transfer Rule.

E. Probate Court guardianship, while either parent is living within the State of Rhode Island, is not recognized for eligibility purposes unless such guardianship was petitioned by a state agency for the welfare of the student. Guardianship is recognized for eligibility purposes when both parents are deceased, or when both parents are physically absent from the State of Rhode Island, or when both parents or the surviving parent has been decreed incompetent or unfit by court order, or when a specific waiver has been obtained pursuant to Article 1, Section 16. No student under guardianship is eligible without a written eligibility finding confirming compliance with the above and issued by the RIIL. The use of a student-athlete under guardianship before such written confirmation shall constitute the use of an ineligible player. Such eligibility finding will be given after the student under Probate Court guardianship has been subject to the waiting period of 35 days in each sport s/he participated in during the previous school year.

F. A student in any school system operating more than one high school, who is transferred by the administrative office for disciplinary or attendance reasons shall be subject to all provisions of the Transfer Rule before becoming eligible at the receiving school in each sport which s/he participated at the sending school.

G. If the athlete severs connection with any school for a period of two weeks or more, the athlete cannot become eligible for athletics until the athlete has completed the waiting period of 35 days in each sport of which s/he participated in at their sending school from the date of the athlete's enrollment at the receiving school and

then only if all other eligibility requirements are met. This section shall not be interpreted to apply to students absent from school because of illness.

H. No school shall allow the participation of any student who is ineligible in any regard. This participation applies to sub-varsity and school-sponsored club teams just as strictly as it applies to varsity contests, both league and non-league. During the time a student-athlete is ineligible because of the Transfer Rule, s/he is permitted to practice with the team.

I. **Penalty for an Eligibility Violation:** Loss of eligibility in the sport involved for a number of RIIL games equal to the number of days in which the athlete ineligible participated. Such loss of eligibility shall commence with the date of the last infraction and, if necessary, shall extend into the RIIL days of the same sport for the following year.

\*　　\*　　\*



# Article 8: APPEALS

<u>Section 1. PROCEDURE</u>

    D.  The normal channel of communication with the Committee is to the Executive Director who may decide in the first instance on all matters. However, the Executive Director may refer any matter to the proper committee for a decision.

    E.  Any ruling of the Executive Director may be appealed to the proper Committee. If no specific Committee exists, the appeal will be to the Executive Committee of the sport involved.

    F.  Appeals from the Committee or Executive Committee shall be to the full membership of the Committee whose decision shall be final.

<u>Section 2. CORRESPONDENCE</u>

    A.  All correspondence shall be sent care of the Executive Director. All appeals and requests shall be in writing. All appeals shall have a certification confirming that a copy has been sent to all parties in interest.

<u>Section 3. PROTESTS</u>

    A.  In the case of game protests the procedure outlined in Article 5 shall be the procedure followed.

<u>Section 4. WAIVER REQUEST HEARING PROCEDURE</u>

    A.  The procedure outlined speaks to and violations of the bylaws of the Rhode Island Interscholastic League.

    B.  Matters dealing with individual sports, i.e. protests, schedule concerns, league alignments, official's complaints, etc. will be handled by the Executive Committee of the sport (Article 8, Sections 1 and 5).  The committee(s) will be chaired by the Director/designee of the sport.

    C.  Student eligibility matters (See Article a Section 16).

<u>Section 5. INDIVIDUAL APPEALS</u>

    A.  Individuals may appeal any decision involving them alone through their Principal to the proper body outlined above provided the appeal is not made based upon a judgment call of an official. No appeals of ejections of athletes or coaches by game officials will be allowed.

<u>Section 6. TIME LIMITATIONS</u>

    A.  Appeals must be received at each level within fourteen (14) calendar days.

<u>Section 7. DECISIONS</u>

    A.  Initial Decisions regarding appeals are effective upon delivery (orally or by fax or by other means) to the school Principal. The school Principal shall deliver a copy to the student(s), parents or personnel involved. For Decisions involving others, the Decision shall be effective upon posting to the U.S. mail.

    B.  Written notice of the appeal application shall be given to all parties. Decisions are not automatically stayed pending appeal. After a written notice of appeal is filed, a written request for a stay may be made.

Any application for a stay of enforcement must ordinarily be made in the first instance to the Executive Director, Sub-Committee or Executive Committee making the ruling. The request shall show the reasons for the relief requested and the facts relied upon.

C.  In extraordinary circumstances, the Executive Director may, in his exclusive discretion, decide on the request for a stay rather than refer the matter to the Sub-Committee or Executive Committee involved.

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
         Subchapter II. Public Services (Refs & Annos)
            Part A. Prohibition Against Discrimination and Other Generally Applicable Provisions

42 U.S.C.A. § 12131

§ 12131. Definitions

Currentness

As used in this subchapter:

**(1) Public entity**

The term "public entity" means--

   **(A)** any State or local government;

   **(B)** any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

   **(C)** the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

**(2) Qualified individual with a disability**

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

**CREDIT(S)**

(Pub.L. 101-336, Title II, § 201, July 26, 1990, 104 Stat. 337.)

42 U.S.C.A. § 12131, 42 USCA § 12131
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  1

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter II. Public Services (Refs & Annos)
        Part A. Prohibition Against Discrimination and Other Generally Applicable Provisions

42 U.S.C.A. § 12132

§ 12132. Discrimination

Currentness

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

**CREDIT(S)**

(Pub.L. 101-336, Title II, § 202, July 26, 1990, 104 Stat. 337.)

42 U.S.C.A. § 12132, 42 USCA § 12132
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

End of Document       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Add. 065

<div style="border:1px solid">

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

</div>

42 U.S.C.A. § 12182

§ 12182. Prohibition of discrimination by public accommodations

Currentness

**(a) General rule**

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

**(b) Construction**

**(1) General prohibition**

**(A) Activities**

**(i) Denial of participation**

It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

**(ii) Participation in unequal benefit**

It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

**(iii) Separate benefit**

It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such

action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

**(iv) Individual or class of individuals**

For purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement.

**(B) Integrated settings**

Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

**(C) Opportunity to participate**

Notwithstanding the existence of separate or different programs or activities provided in accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different.

**(D) Administrative methods**

An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration--

**(i)** that have the effect of discriminating on the basis of disability; or

**(ii)** that perpetuate the discrimination of others who are subject to common administrative control.

**(E) Association**

It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

**(2) Specific prohibitions**

**(A) Discrimination**

For purposes of subsection (a), discrimination includes--

**(i)** the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges,

Add. 067

advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

**(ii)** a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

**(iii)** a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

**(iv)** a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

**(v)** where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

**(B) Fixed route system**

**(i) Accessibility**

It shall be considered discrimination for a private entity which operates a fixed route system and which is not subject to section 12184 of this title to purchase or lease a vehicle with a seating capacity in excess of 16 passengers (including the driver) for use on such system, for which a solicitation is made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

**(ii) Equivalent service**

If a private entity which operates a fixed route system and which is not subject to section 12184 of this title purchases or leases a vehicle with a seating capacity of 16 passengers or less (including the driver) for use on such system after the effective date of this subparagraph that is not readily accessible to or usable by individuals with disabilities, it shall be considered discrimination for such entity to fail to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities.

**(C) Demand responsive system**

Add. 068

For purposes of subsection (a), discrimination includes--

**(i)** a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

**(ii)** the purchase or lease by such entity for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

**(D) Over-the-road buses**

**(i) Limitation on applicability**

Subparagraphs (B) and (C) do not apply to over-the-road buses.

**(ii) Accessibility requirements**

For purposes of subsection (a), discrimination includes (I) the purchase or lease of an over-the-road bus which does not comply with the regulations issued under section 12186(a)(2) of this title by a private entity which provides transportation of individuals and which is not primarily engaged in the business of transporting people, and (II) any other failure of such entity to comply with such regulations.

**(3) Specific construction**

Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

## CREDIT(S)

(Pub.L. 101-336, Title III, § 302, July 26, 1990, 104 Stat. 355.)

42 U.S.C.A. § 12182, 42 USCA § 12182
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Code of Federal Regulations
    Title 28. Judicial Administration
        Chapter I. Department of Justice
            Part 35. Nondiscrimination on the Basis of Disability in State and Local Government Services (Refs & Annos)
            Subpart B. General Requirements

28 C.F.R. § 35.130

§ 35.130 General prohibitions against discrimination.

Effective: October 11, 2016
Currency

<For statute(s) affecting validity, see: 42 U.S.C.A. § 12101 et seq.>

(a) No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity.

(b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—

(i) Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others;

(iv) Provide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(vi) Deny a qualified individual with a disability the opportunity to participate as a member of planning or advisory boards;

---

(vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

(2) A public entity may not deny a qualified individual with a disability the opportunity to participate in services, programs, or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities.

(3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration:

(i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;

(ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

(4) A public entity may not, in determining the site or location of a facility, make selections—

(i) That have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination; or

(ii) That have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities.

(5) A public entity, in the selection of procurement contractors, may not use criteria that subject qualified individuals with disabilities to discrimination on the basis of disability.

(6) A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability. The programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part.

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

Add. 071

(ii) A public entity is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 35.108(a)(1)(iii).

(8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

(c) Nothing in this part prohibits a public entity from providing benefits, services, or advantages to individuals with disabilities, or to a particular class of individuals with disabilities beyond those required by this part.

(d) A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

(e)(1) Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

(2) Nothing in the Act or this part authorizes the representative or guardian of an individual with a disability to decline food, water, medical treatment, or medical services for that individual.

(f) A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part.

(g) A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

(h) A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

(i) Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

**Credits**
[Order No. 3180–2010, 75 FR 56178, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53225, Aug. 11, 2016]

SOURCE: 56 FR 35716, July 26, 1991; 75 FR 56177, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53223, Aug. 11, 2016, unless otherwise noted.

Add. 072

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134, 12131, and 12205a.

Notes of Decisions (1908)

Current through August 21, 2024, 89 FR 67819. Some sections may be more current. See credits for details.

End of Document      © 2024 Thomson Reuters. No claim to original U.S. Government Works.